IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AIRCRAFT HOLDING SOLUTIONS, LLC, et al., | § | |
| | § | |
| | § | |
| Plaintiffs-counterdefendants, | § | |
| | § | Civil Action No. 3:18-CV-0823-D |
| VS. | § | |
| | § | |
| LEARJET, INC. d/b/a BOMBARDIER AIRCRAFT SERVICES (BAS), | § | |
| | § | |
| | § | |
| Defendant-counterplaintiff, | § | |
| | § | |
| and | § | |
| | § | |
| BOMBARDIER INC., | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this action by plaintiffs-counterdefendants Aircraft Holding Solutions, LLC ("AHS") and CH300, LLC ("CH300") arising from damage to a Bombardier Challenger 300 aircraft ("Aircraft") during routine periodic maintenance and inspection, defendant-counterplaintiff Learjet Inc. d/b/a Bombardier Aircraft Services ("BAS") moves for partial summary judgment, defendant Bombardier Inc. ("Bombardier") moves for summary judgment, and AHS and CH300 move for partial summary judgment. For the reasons that follow, the court grants Bombardier's motion for summary judgment and dismisses the action against it by Fed. R. Civ. P. 54(b) final judgment filed today; grants in part and denies in part BAS's motion for partial summary judgment; and grants in part and denies in part plaintiffs'

motion for partial summary judgment.

I

A

Until on or about March 17, 2021, when plaintiffs sold the Aircraft to a third party, and at all times relevant to this lawsuit, AHS was the registered owner of the Aircraft,[1] and CH300 held the "exclusive license to possess, use and operate [the Aircraft]" and was responsible for its maintenance.  BAS App. (ECF No. 186) at 154.[2]

On February 7, 2017 Mountain High Aviation, LLC ("Mountain High"), acting on behalf of CH300, executed a proposal ("Proposal") with BAS for routine maintenance and inspection services to be performed on the Aircraft.  The Proposal states, *inter alia*, that "[s]ignature below indicates your acknowledgment of the Bombardier Aircraft Services Proposal as well as the Proposal & Work Order Terms and Conditions."  Ps. App. (ECF No. 119) at 45.

On March 28, 2017 Mountain High delivered the Aircraft to BAS's Dallas facility and

---

[1]Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when it is necessary to set out evidence that is contested, will do so favorably to the side who is the summary judgment nonmovant in the context of that evidence.  *See, e.g., GoForIt Ent., LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

[2]Before the Aircraft was sold, it was owned by a trust of which AHS was the trustee.  But at all relevant times, the FAA Registry listed AHS, as trustee, as the Aircraft's registered owner.

- 2 -

signed Aircraft Work Order 198284 ("Work Order"), which authorized BAS to perform 144-month inspection services and maintenance on the Aircraft. The Work Order incorporated the Proposal by reference and incorporated the Bombardier Aircraft Service Center Work Order Terms and Conditions ("Work Order Terms and Conditions"), which were included on the back of the Work Order.[3]

On March 29, 2017, while BAS was performing maintenance under the Work Order, the Aircraft fell off its maintenance jacks, resulting in "substantial damage" to the fuselage and wings (the "Incident"). Ps. Br. (ECF No. 118) at 8. In an internal email following the Incident, BAS preliminarily indicated that the jacks had not been properly installed. *See* Ps. App. (ECF No. 199) at 143 ("'Preliminary' observation—the jack pad was not seated in the cup of the jack, but rather on the edge and aircraft rolled off the jack."). BAS later concluded that "the damage was a result of high wind gusts of over 30 mph causing the aircraft to lift resulting in a failure of the jacks." BAS App. (ECF No. 186) at 22; *see also* Ps. App. (ECF No. 199) at 150 (April 12, 2017 Executive Summary describing "Root Cause" of damage as: "[o]pening of the southwest hangar doors during high southwest winds (up to 32 MPH) coupled with the slightly open northeast door created a venturi [e]ffect which ultimately acted on the flight control surfaces causing the left wing to rise." (first brackets in original)). The wind gusts had entered the hangar when a crew working on a different aircraft opened the hangar doors to move that aircraft.

---

[3]The court for convenience will sometimes refer to the Work Order, Proposal, and Work Order Terms and Conditions, collectively, as the "Work Order."

- 3 -

BAS maintains that Roman Ruiz ("Ruiz") was CH300's maintenance representative. BAS notified Ruiz about the Incident and offered to repair the Aircraft and return it to service. BAS then entered into an August 1, 2017 Services Agreement ("Services Agreement") with Bombardier to make the repairs.

Bombardier prepared a Damage Assessment and Repair Proposal for the work necessary to repair the Aircraft and return it to service. Bombardier then conducted the repairs under a separate work order, numbered 198551 ("Repair Order"). According to plaintiffs, while completing the Repair Order, Bombardier caused further damage to the Aircraft.[4]

On October 15, 2018 BAS informed plaintiffs that the damage repairs and 144-month inspection were almost complete and that the Aircraft would be available for plaintiffs to retrieve from BAS's facility on October 31, 2018. BAS also informed plaintiffs that, before returning the Aircraft to service, BAS needed to perform a final full body symmetry inspection and would like to conduct a test flight. BAS also notified plaintiffs that their refusal to authorize the final work necessary to return the Aircraft to service would result in BAS's "tender[ing] the aircraft to the owner at the BAS facility in its then current condition,

_____

[4]Plaintiffs contend that Bombardier damaged the ribs in the Aircraft's left wing; further damaged the Aircraft's symmetry and alignment; failed to properly document damage to the Aircraft; improperly investigated and/or improperly reported continued airworthiness requirements; and caused and made permanent deviations in the Aircraft's symmetry and alignment, primary structural elements (the ribs), and other portions of the Aircraft that are deviations from its original design, issuing a Non-Incorporated Engineering Order "accepted" effective for the Aircraft only, and for no other Bombardier Challenger 300.

with all storage/hangar expense and risk of loss subsequently to be borne by the owner." BAS App. (ECF No. 186) at 187.

Plaintiffs responded by an October 19, 2018 letter, asserting that defendants' "negligence rendered the Aircraft unairworthy and the Aircraft is still unairworthy"; that AHS and CH300 did not approve of any of the post-Incident repairs; that AHS and CH300 had filed a complaint with the Federal Aviation Administration ("FAA"), the FAA was investigating the complaint, and the investigation could be expected to last 90 days or more; that, during this time, plaintiffs were "demand[ing] that [BAS] continue to store the Aircraft to prevent spoliation issues"; that plaintiffs were rejecting BAS's demand that they take possession of the Aircraft; and that plaintiffs were rejecting BAS's demand that they pay costs and fees related to storage of the Aircraft. BAS App. (ECF No. 186) at 190.

BAS signed off on the damage repairs and closed the Repair Order by October 31, 2018. At the same time, BAS completed the 144-month inspection and all services included in the Proposal. To avoid further damage to the Aircraft, BAS continued to store the Aircraft at its facility and performed preventative maintenance and time-controlled inspections that came due on the Aircraft.

On March 10, 2020 the FAA issued a memorandum concluding, *inter alia*, that

> [t]he allegation that [the Aircraft] is "unairworthy" and "unsafe" in the context of work performed as a result of the damage from falling off the jacks is not substantiated. The aircraft has yet to be returned to service after being repaired and is due numerous calendar driven inspections, rending the aircraft unairworthy until such a time that the required inspections are accomplished.

BAS App. (ECF No. 186) at 71 (emphasis omitted).

On or about March 17, 2021 plaintiffs sold the Aircraft to a third party. According to BAS, before the sale, plaintiffs never permitted BAS to do what was required to return the Aircraft to service.

B

AHS and CH300 filed the instant lawsuit in state court against BAS and Bombardier Aerospace Corporation ("BAC"), alleging various claims under Texas law.[5] Defendants removed the case to this court. Plaintiffs obtained leave to file an amended complaint that added Bombardier as a defendant. They later obtained leave to file a second amended complaint ("SAC"), which is plaintiffs' operative pleading.

In the SAC, CH300 alleges claims for breach of contract and violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code Ann. §§ 17.41-17.63 (West 2021), against BAS; AHS alleges a claim for negligence and gross negligence against BAS and Bombardier; and AHS alleges a claim for breach of implied bailment against BAS.[6]

BAS asserts counterclaims against plaintiffs for breach of contract, quantum meruit/unjust enrichment, and declaratory judgment, seeking to recover the storage fees and

---

[5]On April 23, 2021 the parties filed a joint notice and stipulation dismissing with prejudice all of the claims plaintiffs had asserted against BAC.

[6]AHS also alleged claims for suit to quiet title and declaratory judgment against BAS, but it voluntarily dismissed those claims on July 21, 2021.

maintenance expenses for the Aircraft that BAS has incurred since October 31, 2018.

In their answers, Bombardier and BAS assert as affirmative defenses, *inter alia*, the economic loss doctrine and contractual limitations, including contractual disclaimers.

Three summary judgment motions are now before the court. On March 19, 2021 plaintiffs filed a motion for partial summary judgment addressed to BAS's breach of contract counterclaim, AHS's negligence claim against BAS, and certain of BAS's affirmative defenses. On August 13, 2021 Bombardier filed a motion for summary judgment, and BAS filed a motion for partial summary judgment.[7] Bombardier and BAS both seek summary judgment on AHS's claim for negligence and gross negligence based on the economic loss rule and on AHS's alleged inability to raise a genuine fact issue as to the merits of the claim. BAS also seeks summary judgment on CH300's DTPA claim, AHS's implied bailment claim, and AHS's request for exemplary damages, and it seeks to limit plaintiffs' damages to those allowed by the Proposal. The court has heard oral argument.

II

When a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the

---

[7]Bombardier and AHS initially filed these motions on March 19, 2021. In the court's June 15, 2021 memorandum opinion and order granting plaintiffs leave to file their second amended complaint and to amend their answer and affirmative defenses to BAS's counterclaim, the court granted defendants leave to amend or supplement their summary judgments already on file. Defendants filed their amended motions on August 13, 2021.

nonmovant's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) ( per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

To be entitled to summary judgment on a claim or defense on which the moving party will bear the burden of proof at trial, the movant "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that the movant must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

BAS and Bombardier maintain that AHS's claim against them for negligence and gross negligence is barred by the economic loss rule.

A

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam) (citations omitted).  This rule reflects the view that economic losses in these contexts "are more appropriately addressed through statutory warranty actions or common law breach of contract suits." *Fleming v. Kinney ex rel. Shelton*, 395 S.W.3d 917, 923-24 (Tex. App. 2013, pet. denied); *see also Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011) ("[W]e have applied the economic loss rule only in cases involving defective products or failure to perform a contract.  In both of those situations, we held that the parties' economic losses were more appropriately addressed through statutory warranty actions or common law breach of contract suits than tort claims.").  Not all tort claims, however, "arising out of a contractual setting" are precluded by the rule.  *Chapman Custom Homes*, 445 S.W.3d at 718.  To determine whether the economic loss rule bars a tort claim, the court must "analyze[] both the source of the duty and the nature of the remedy." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998).  If "the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely

- 9 -

the economic loss of a contractual benefit," the economic loss rule does not apply. *Chapman Custom Homes*, 445 S.W.3d at 718 (citations omitted); *see also Sullivan v. PS Funding Inc*., 2021 WL 3556958, at *2 (N.D. Tex. July 15, 2021) (Toliver, J.) ("[I]f the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff may bring a tort claim in addition to a claim for breach of contract."), *rec. adopted*, 2021 WL 3553483 (N.D. Tex. Aug. 11, 2021) (Kinkeade, J.).

B

The court considers first whether the economic loss rule bars AHS's claim for negligence and gross negligence against BAS based on the Incident itself.[8]

1

The court must initially determine the source of the duty that AHS contends BAS breached with respect to the Incident.

---

[8]It is unclear from the SAC whether AHS intends to assert a claim against BAS for negligence and gross negligence based on the post-Incident repair of the Aircraft. Plaintiffs' counsel asserted at oral argument:

> [t]here are two distinct negligence claims that AHS asserts, one against BAS, the owner of the repair station, for the negligence that led to the initial incident that caused the aircraft to fall from its jacks causing substantial damages. The second negligence claim is asserted against Bombardier for its post-inciden[t] negligence in attempting to perform repairs on this aircraft that caused additional property damages to the aircraft.

Draft Hrg. Tr. 19. Assuming *arguendo* that AHS intends to assert a negligence claim against BAS based on post-Incident conduct, the court holds that the claim is barred under the economic loss doctrine for the reasons explained below. *See infra* § III(C).

Texas law has long imposed on all persons, in the use of their property, a "duty to exercise ordinary care to avoid injury or damage to the property of others." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 614 (Tex. 2016) (quoting *Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 563 (Tex. 1948)); *see also Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010) ("Independent of its contractual obligations, Gilbert owed RTR the duty to comply with law and to conduct its operations with ordinary care so as not to damage RTR's property, and . . . could be liable for damages it caused by breaching its duty."). But in addition to this common law duty, under the facts of this case, BAS also had a contractual duty to perform maintenance and inspection services, and to do so with reasonable care. *See, e.g., Chapman Custom Homes*, 445 S.W.3d at 718 ("[A] common law duty to perform with care and skill accompanies every contract and . . . the failure to meet this implied standard might provide a basis for recovery in tort, contract, or both under appropriate circumstances." (citing *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947)).

To determine the origin of the duty that BAS allegedly breached, the court "examine[s] the role of the contract in governing the use of the property." *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 725 (5th Cir. 2015) (citing cases); *see also Castle Tex. Prod. Ltd. P'ship v. Long Trs.*, 134 S.W.3d 267, 274 (Tex. App. 2003, pet. denied) ("[I]f a contract spells out the parties' respective rights regarding a particular matter, the contract, not common law tort principles, governs any dispute about that matter.").

- 11 -

> If the defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort.  Conversely, if the defendant's conduct—such as failing to publish an advertisement—would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract.

*Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991).  "One helpful rule of thumb in discerning whether the defendant's conduct constitutes an independent tort is to inquire whether, if the defendant fully complied with the contract, the plaintiff could still sue under tort."  *Nat'l Rifle Ass'n of Am. v. Ackerman Mcqueen, Inc.*, 2021 WL 3618113, at *18 (N.D. Tex. Aug. 16, 2021) (Fish, J.) (citing *Lincoln Gen. Ins.*, 787 F.3d at 726).

The contract between CH300[9] and BAS was for the performance of certain enumerated inspection and maintenance services.  *See* BAS App. (ECF No. 186) at 9-13 (listing "Workscope Details," including various inspection and maintenance items). AHS does *not* contend that BAS only failed to satisfactorily complete the contracted-for inspection or maintenance services or that the Aircraft was damaged only because of any such failure.[10]

---

[9]Although Mountain High is the party who actually entered into the contract with BAS, it is undisputed that Mountain High was acting as CH300's agent.  *See* Ps. Br. (ECF No. 197) at 3 (plaintiffs stating that "CH300, through its agent, [Mountain High], executed a certain proposal with BAS for maintenance and inspection services to be performed on the Aircraft.").  Accordingly, the court will refer to CH300 as the contracting party, unless the context otherwise requires.

[10]Plaintiffs do allege in their breach of contract claim that BAS breached the February 7, 2017 Proposal and the Work Order by failing to perform the work on the Aircraft in a good and workmanlike manner.  SAC ¶ 16.  But they also allege that BAS caused the Incident through negligence unrelated to its contractual performance.

*Cf. Sw. Bell Tel. Co.*, 809 S.W.2d at 495 (where defendant inadvertently omitted plaintiff's advertisement from Yellow Pages and plaintiff sued for negligence, economic loss rule applied because the "duty to publish [plaintiff's] advertisement arose solely from the contract" and plaintiff's damages "were only for the economic loss caused by [defendant's] failure to perform.").   In fact, even if it is assumed that BAS had fully complied with the terms of the Proposal and Work Order—i.e., it had satisfactorily completed all required maintenance and inspection work—AHS could still bring its tort-based negligence claim based on the Incident.  *See Nat'l Rifle Ass'n of Am.*, 2021 WL 3618113, at *18.  This is because AHS alleges that the Incident resulted from negligent conduct *unrelated to* BAS's performance of the contracted-for services.  *Compare* SAC ¶ 16 (breach of contract), *with id.* ¶ 24 (negligence).  In other words, AHS asserts that BAS engaged in negligent conduct that independently breached its common law duty of care.  *See Chapman Custom Homes*, 445 S.W.3d at 718 ("[A] party states a tort claim[, *inter alia*,] when the duty allegedly breached is independent of the contractual undertaking[.]").

AHS maintains that "two factors contributed to the damage to AHS's Aircraft: (1) BAS's failure to properly jack the Aircraft, and (2) BAS employees opening the doors to the hangar, allowing a wind gust to blow the Aircraft to the ground."  Ps. Br. (ECF No. 197) at 17.  Although, as defendants point out, the Incident *did* occur when the Aircraft fell off the jacks that it had been placed on in furtherance of the contracted-for work, AHS does not contend that it was the negligent performance of the contracted-for work that damaged the Aircraft.  It maintains instead that it was the confluence of the improper jacking and the

negligent opening of the hangar doors in relation to another aircraft that caused the Incident, giving rise to its tort claim.  Moreover, even if a reasonable jury could find that the failure to properly jack the Aircraft contributed to the Aircraft's damage, "the [economic loss] rule does not apply if a person negligently performs a contract in a way that injures property or persons *incidental to the contract work being done*."  *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 635 (Tex. App. 2020, no pet.) (emphasis added) (citing *Chapman Custom Homes*, 445 S.W.3d at 718-19; *Montgomery Ward & Co.*, 204 S.W.2d at 510); *see also Chapman Custom Homes*, 445 S.W.3d at 718 ("Having undertaken to install a plumbing system in the house, the plumber assumed an implied duty not to flood or otherwise damage the trust's house while performing its contract with the builder.").  BAS's employees' opening the hangar doors to move a *different* aircraft would certainly have been conduct that was incidental to the contract work (i.e., maintenance and inspection services) being done on the Aircraft.  *See Dixie Carpet Installations*, 599 S.W.3d at 635.

Having undertaken to perform routine maintenance and inspection services on the Aircraft, BAS assumed an implied duty not to otherwise damage the Aircraft during the course of its work.  *See Chapman Custom Homes*, 445 S.W.3d at 718.  AHS's claim for negligence and gross negligence is based on BAS's alleged breach of this implied common law duty.  Accordingly, the source of the duty allegedly breached was tort-based, not contract-based.

- 14 -

2

For largely the same reasons, the court also concludes that the damages AHS allegedly suffered extend beyond the loss of CH300's anticipated benefit under the Proposal and Work Order. *Id.* at 719. As stated above, CH300 and BAS bargained for certain specified inspection and maintenance services. As AHS points out in its response, it is "not seeking the value of performance of the maintenance inspection, nor is it seeking money paid to another entity to perform a replacement maintenance inspection." Ps. Br. (ECF No. 197) at 19. Rather, it seeks to recover for the extensive damage caused to the Aircraft when, as a result of alleged negligence unrelated to the performance of BAS's contractual obligations, the Aircraft fell to the ground.

In the SAC, AHS seeks as relief "the difference between the fair market value of the Aircraft when it was delivered to BAS and its fair market value when sold or at time of trial." SAC ¶ 24. This proposed measure of damages, although economic in nature,[11] is independent of, and unrelated to, CH300's contractual expectancy or "benefit of the bargain" under the Proposal and Work Order. This measure of damages seeks to approximate the extent of the damage to the Aircraft as a whole, giving no consideration to the value or anticipated value of the bargained-for maintenance and inspection services. *See Chapman*

---

[11]Courts addressing the economic loss rule have held that "when the source of the duty lies outside the contract, economic damages are recoverable." *SCS Builders, Inc. v. Searcy*, 390 S.W.3d 534, 540 (Tex. App. 2012, no pet.); *see also Mize v. BMW of N. Am., LLC*, 2021 WL 6502099, at *11 (N.D. Tex. Oct. 1, 2021) (Reno, J.) ("Even pure economic losses can be recovered 'when the source of the duty lies outside the contract.'" (citation omitted)), *rec. adopted*, 2021 WL 5979469 (N.D. Tex. Dec. 17, 2021) (Kacsmaryk, J.).

*Custom Homes*, 445 S.W.3d at 719 (economic loss rule did not apply where, *inter alia*, "the damages allegedly caused by the breach of [an independent] duty extend beyond the economic loss of any anticipated benefit under the plumbing contract.").

Accordingly, the court concludes that the economic loss rule does not bar AHS's claim for negligence and gross negligence against BAS based on the Incident itself.

3

BAS maintains in its reply brief that its contract with CH300 contained an inherent requirement not to damage the property of which it had taken possession pursuant to a contractual arrangement, pointing to the "contract-based bailment-style arrangement" as the source of this inherent contractual duty.  BAS Reply (ECF No. 201) at 5.  BAS contends that "BAS took possession of an Aircraft, and it was damaged while it was in BAS's possession, while the contracted-for work was being performed and during the existence of a bailment relationship.  Therefore, the damages were within the scope of contract-based claims, duties, and expectancies."  *Id.* at 6.  In essence, BAS argues that, because a bailment relationship existed between it and CH300, and because the Aircraft was damaged while in BAS's possession, the duty that was allegedly breached was *contractual* and not an independent tort duty.  The court declines to accept this argument for at least the following reasons.

First, BAS raises the argument for the first time in its reply brief, and the court typically declines to consider arguments raised for the first time in reply.  *See, e.g., Jacobs v. Tapscott*, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) ("[T]he court will not consider an argument raised for the first time in a reply brief." (citation omitted)),

*aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008).

Second, BAS has failed to provide any authority for the proposition that, under Texas law, the economic loss rule bars plaintiffs from bringing a tort claim when property damage occurs in the context of a "bailment-style arrangement."[12]

### C

The court next considers whether the economic loss rule bars AHS's claim for negligence and gross negligence against BAS and Bombardier based on their post-Incident repairs to the Aircraft.

### 1

The duty that AHS contends Bombardier breached with respect to repairing the Aircraft is unquestionably the subject of a contract between BAS and Bombardier. The Services Agreement that BAS and Bombardier signed provides that "Bombardier will provide or cause to be provided . . . Services . . . for the sole purpose of repairing damage sustained by Aircraft due to a jack failure." Ps. App. (ECF No. 199) at 279. And AHS's claim for negligence and gross negligence against Bombardier is based entirely on the damage allegedly caused to the Aircraft during the course of these contracted-for repairs.

---

[12]In *Jacobs v. JPMorgan Chase Bank* the court stated that it was hesitant to rule in the context of a motion to dismiss "that the economic loss rule necessarily bars a bailee from pursuing tort remedies." *Jacobs v. JPMorgan Chase Bank*, 2016 WL 8902587, at *4 (N.D. Ga. May 24, 2016). The court noted that "courts in other jurisdictions have reached different conclusions as to whether a bailor has rights against a bailee in both tort and contract," and it cited Texas law for the proposition that "[c]laims for breaches of bailment agreements generally can be brought as contract or tort claims." *Id.* (quoting *Baker v. Eckman*, 213 S.W.3d, 306, 310 (Tex. 2006)).

*See* Ps. Br. (ECF No. 198) at 13-14 (arguing that "AHS's claims against Bombardier are for damages to the Aircraft caused by factors unrelated to BAS's performance of the maintenance.  Bombardier damaged the Aircraft during repairs.").  Unlike the Incident-based claim against BAS, there is no allegation that Bombardier owed BAS (and, by extension, CH300 and AHS, as discussed below) a legal duty beyond what it owed under the contract.  And because, as pleaded, Bombardier's conduct can give rise to liability only if it breached the Services Agreement, AHS's claim "sounds only in contract."  *Sw. Bell Tel. Co.*, 809 S.W.2d at 494.  Stated another way, because no factual basis for AHS's tort claim would exist if Bombardier had fully complied with its obligations under the Services Agreement, the origin of the duty allegedly breached is contractual, and the economic loss doctrine applies.  *See Lincoln Gen. Ins.*, 787 F.3d at 726 (citing *Exxon Mobil Corp. v. Kinder Morgan Operating L.P.*, 192 S.W.3d 120, 128 (Tex. App. 2006, no pet.)).

2

To the extent that plaintiffs also seek to hold BAS liable for its role in the post-Incident repairs,[13] plaintiffs have pleaded that "AHS had no choice but to agree to an implied agreement to allow BAS to repair the Aircraft."  SAC ¶ 12.  As with Bombardier, BAS's failure to properly repair the Aircraft would give rise to liability only because this failure would constitute a breach of the alleged implied repair agreement, even though AHS "did not agree to any written proposal or agreement regarding same."  *Id.*  Accordingly, the only

---

[13]It is unclear whether they do.  *See supra* note 8.

- 18 -

duty that BAS allegedly breached with respect to the post-Incident repairs is contractual and arises either from the Services Agreement or from the implied repair agreement.

3

AHS seeks to avoid application of the economic loss doctrine based on the lack of privity between it and Bombardier.  Under Texas law, however, privity of contract is not a requirement for application of the economic loss rule.  *Sharyland Water Supply*, 354 S.W.3d at 419; *see also Brandon v. Wells Fargo Bank, N.A.*, 2020 WL 2776714, at *14 n.4 (Tex. App. May 28, 2020, no pet.) (mem. op.) ("The economic-loss rule, when applicable, not only bars claims against those in a direct contractual relationship but also precludes tort claims between parties who are not in contractual privity." (citing cases)); *A & H Props. P'ship v. GPM Eng'g*, 2015 WL 9435974, at *2 (Tex. App. Dec. 23, 2015, no pet.) (mem. op.) ("The economic-loss rule not only applies to bar claims against those in a direct contractual relationship but also applies to preclude tort claims between parties who are not in contractual privity."); *Trebuchet Siege Corp. v. Pavecon Com. Concrete, Ltd.*, 2014 WL 4071804, at *6 (Tex. App. Aug. 19, 2014, no pet.)  (mem. op.) ("The economic loss rule not only applies to bar claims against those in a direct contractual relationship but also applies to preclude tort claims between parties who are not in privity.").[14]

_____

[14]Federal courts have also applied the economic loss rule in the absence of contractual privity.  *See, e.g., In re All Tex. Elec. Contractors, Inc*., 2021 WL 4467548, at *4 (Bankr. S.D. Tex. Sept. 29, 2021) ("The Texas Supreme Court has clarified that the lack of a contractual arrangement between Plaintiff and Defendant will not bar application of the economic loss rule." (citing *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 238 (Tex. 2014))); *Valley Ridge Roofing & Constr., LLC v. Morash*, 2020 WL 533445, at *4

- 19 -

For example, in *Trans-Gulf Corp. v. Performance Aircraft Services, Inc*., 82 S.W.3d 691 (Tex. App. 2002, no pet.), the purchaser of an airplane brought claims against a contractor who had been hired by the airplane's seller as well as a subcontractor hired by that contractor to perform repair work. *Id.* at 693. The purchaser alleged that the contractors, with whom the purchaser had no contractual relationship, used improper sealant, and asserted negligence claims against them. *Id.* The court held that the purchaser's tort claims for economic losses against these "contractual strangers" were barred by the economic loss doctrine. *Id.* at 695.

Similarly, in *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103 (Tex. App. 2000, no pet.), an oil and gas company contracted with a geological contractor to assist in choosing a drilling site. *Id.* at 105-06. The contractor used defective computer software, resulting in the drilling of a dry well. *Id.* at 106. The oil and gas company sought to recover its economic losses against the software developer, with whom it had no contractual relationship, under a negligence theory. *Id.* The court rejected the argument that the software developer owed the oil and gas company a duty in tort, and it held that the economic loss doctrine precluded the oil and gas company's negligence claims against the software

---

(N.D. Tex. Feb. 3, 2020) (Scholer, J.) ("Plaintiff argues the economic loss rule does not apply because Defendant was not a party to the underlying contract. Privity, however, is not a prerequisite to invoking the economic loss rule." (citation omitted)); *360 Mortg. Grp., LLC v. Castle Mortg. Corp*., 2019 WL 1102224, at *2 (W.D. Tex. Mar. 8, 2019) (applying economic loss rule where no contract existed between plaintiff and defendant, and noting that "Texas courts routinely apply the economic loss rule to bar tort claims between parties who are not in contractual privity.").

developer. *Id.* at 106-07.

Accordingly, the lack of privity between AHS and Bombardier does not preclude application of the economic loss rule in this case.

### D

In sum, the economic loss rule bars AHS's tort claims against BAS and Bombardier based on their post-Incident repair conduct, but does not bar AHS's Incident-based claim for negligence and gross negligence against BAS.  The court thus grants Bombardier's motion for summary judgment on AHS's claim for negligence and gross negligence and grants in part and denies in part BAS's motion for summary judgment on this claim.[15]

### IV

Having concluded that the economic loss rule does not bar AHS's Incident-based claim for negligence and gross negligence against BAS, the court now turns AHS's motion for partial summary judgment in which it seeks to establish several elements of its negligence claim.

### A

Under Texas law, the "elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). AHS moves for summary judgment on the duty, breach, and causation elements, contending

---

[15]Bombardier's alternative argument that AHS cannot prove the elements of its claim for negligence and gross negligence is therefore moot.

that the evidence clearly establishes that BAS voluntarily accepted delivery of the Aircraft under circumstances that would be of mutual benefit to both BAS and AHS, as the Aircraft's owner, and that, as a matter of law, BAS owed AHS the legal duties of ordinary or reasonable care in connection with its possession of the Aircraft; that negligence is presumed when a defendant voluntarily accepts the property of another for their mutual benefit but fails to return the property in an undamaged condition; that the evidence establishes that BAS failed to deliver the Aircraft to AHS in an undamaged condition or otherwise attempted to return the Aircraft in a damaged condition; that BAS's own admissions recognize that it breached the duties owed to AHS given that BAS improperly jacked and ballasted the Aircraft and ignored placards warning about opening doors during windy conditions, and that the hangar doors were opened in the first instance while the Aircraft sat on jacks in the hangar; that the evidence—including BAS's "Executive Summary" and internal emails—establishes that BAS's breach of the legal duties owed to AHS proximately caused the Incident and the related damages to the Aircraft; and that, "[i]n short, the evidence establishes the presumption of negligence and otherwise independently establishes the duty, breach, and proximate cause elements of AHS's negligence claim," Ps. Br. (ECF No. 118) at 22.

BAS responds that AHS's negligence claim is barred by the economic loss rule; that summary judgment is improper on the issue of a defendant's actual negligence, even if the facts are undisputed, because those issues are typically reserved for a jury; and that genuine issues of material fact exist as to the breach and causation elements of AHS's negligence

claim.

B

Because AHS will have the burden of proof at trial with respect to its negligence claim against BAS, to obtain summary judgment on this claim, it "must establish 'beyond peradventure all of the essential elements of the claim.'" *Bank One, Tex.*, 878 F. Supp. at 962 (quoting *Fontenot*, 780 F.2d at 1194). For the following reasons, the court concludes that AHS has failed to meet this "heavy" burden. *See Carolina Cas. Ins.*, 603 F.Supp.2d at 923-24 (quoting *Cont'l Cas.*, 2007 WL 2403656, at *10).

To the extent that AHS relies on the presumption of negligence that arises in the context of a bailment,[16] AHS has not established beyond peradventure that a bailment existed between it and BAS. "To create a bailment [under Texas law], there must be (1) delivery of personal property from one person, the bailor, to another, the bailee, for a specific purpose; (2) acceptance of delivery by the bailee; (3) an express or implied contract between the parties that the specific purpose will be realized; and (4) an agreement between the parties that the property will be either returned to the bailor or dealt with according to the bailor's direction." *State v. $281,420.00 in U.S. Currency*, 312 S.W.3d 547, 551 (Tex. 2010) (citing cases). It is undisputed that CH300, through its agent, Mountain High, delivered the Aircraft to BAS, and that there was an express contract for maintenance and inspection services

---

[16]*See Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 635 (Tex. App. 2002, pet. denied) ("The bailor makes a prima facie or presumptive case of negligence by proving bailment and return of the goods by the bailee in a damaged condition, or failure to return the goods at all." (citation omitted).

- 23 -

between CH300 and BAS.  Given these undisputed facts, and AHS's failure to produce any evidence that would establish beyond peradventure the elements of a bailment relationship between AHS and BAS, the court denies AHS's motion to the extent that it relies on a presumption of negligence.

AHS has also failed to establish beyond peradventure that BAS breached a legal duty that BAS owed to AHS, as the owner of the Aircraft.

> To establish breach of duty, the plaintiff must show either that the defendant did something an ordinarily prudent person exercising ordinary care would not have done under the particular circumstances or that the defendant failed to do something that an ordinarily prudent person would have done in the exercise of ordinary care.

*Douglas v. Aguilar*, 599 S.W.3d 105, 108 (Tex. App. 2020, no pet.) (citing cases); *see also Greer v. Wal-Mart Stores, Inc.*, 2017 WL 6512558, at *4 (N.D. Tex. Dec. 19, 2017) (Lynn, C.J.) (same).  "The resolution of a defendant's possible breach of duty is a question of fact" for the jury.  *Caldwell v. Curioni*, 125 S.W.3d 784, 793 (Tex. App. 2004, pet. denied); *see also Alford v. Singleton*, 2018 WL 5621472, at *3 (Tex. App. Oct. 30, 2018, no pet.) ("Generally, the resolution of a defendant's possible breach of duty is a question of fact for the jury." (citing cases)).

In support of its motion, AHS contends:

> BAS's own admissions recognize that it breached the duties owed to AHS given the fact that BAS improperly jacked and ballasted the Aircraft; ignored placards warning about opening doors during windy conditions; and the fact that the doors were opened in the first instance while the Aircraft sat on jacks in the hangar.

- 24 -

Ps. Br. (ECF No. 118) at 20 (citing Ps. App. (ECF No. 119) at 136-41, 143, 145-48). But the evidence that AHS cites does not establish *beyond peradventure* that BAS's employees failed to exercise "ordinary care." In fact, AHS does not adduce any evidence on the question of what an "ordinarily prudent person exercising ordinary care would [or would] not have done under the particular circumstances." *Douglas*, 599 S.W.3d at 108.

Without suggesting that AHS will be unable to prove its negligence claim at trial, the court holds that AHS has not met the heavy beyond peradventure standard required to obtain partial summary judgment. It has failed to demonstrate that there are no genuine and material fact disputes[17] and that it is entitled to summary judgment as a matter of law. Accordingly, the court denies AHS's motion for summary judgment on its negligence claim against BAS.

## C

Plaintiffs also move for summary judgment on certain of BAS's affirmative defenses to AHS's negligence claim.[18]

To the extent plaintiffs move for summary judgment barring BAS's reliance on the

---

[17]"When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)).

[18]BAS also appears to plead these contract-based affirmative defenses with respect to AHS's claims for breach of implied bailment and gross negligence. But because the court is holding that BAS is entitled to summary judgment on separate grounds as to both of these claims, it need not address whether the claims are precluded based on these affirmative defenses.

- 25 -

economic loss rule to defeat AHS's Incident-based negligence claim, the court grants the motion for the reasons explained above. The Incident-based negligence claim against BAS is not precluded by the economic loss rule.

But for the reasons explained above, the court denies plaintiffs' motion to the extent they move for summary judgment barring BAS's reliance on the economic loss rule to defeat AHS's post-Incident negligence claim. The economic loss rule does preclude AHS's tort claims against BAS based on post-Incident repair conduct.

The court grants plaintiffs' motion for summary judgment as to BAS's affirmative defense based on contractual limitations and disclaimers contained in the Proposal and/or Work Order. It is undisputed that AHS was not a party to the Proposal or Work Order. Generally, a contract cannot be enforced against a non-party. *Rapid Settlements, Ltd. v. Green*, 294 S.W.3d 701, 706 (Tex. App. 2009, no pet.) ("It goes without saying that a contract cannot bind a nonparty." (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002))). There are circumstances in which a non-signatory can be bound by other parties' contractual agreements. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (recognizing theories by which a contract can be enforced against a non-signatory). But BAS neither argues nor adduces any evidence that would permit a reasonable jury to find that the Proposal or Work Order is binding on AHS.[13] *See CNOOC Se. Asia Ltd. v. Paladin*

---

[13]Because BAS will have the burden of proof at trial with respect to its affirmative defenses, to overcome AHS's motion for summary judgment, it must produce evidence that is sufficient to create a genuine issue of material fact with respect to the defenses. *See Celotex*, 477 U.S. at 324.

- 26 -

*Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 894-95 (Tex. App. 2007, pet. denied) (holding that the party seeking to enforce a contract against a non-signatory bears the burden of establishing the contract's effect on the non-signatory).  Accordingly, to the extent that AHS moves for summary judgment on BAS's contract-based affirmative defenses to AHS's negligence claim, the court grants AHS's motion.

V

The court now considers BAS's motion for summary judgment on AHS's gross negligence claim.

A

To recover for gross negligence under Texas law, a plaintiff must satisfy the elements of an ordinary negligence claim and also prove by clear and convincing evidence that the defendant acted with gross negligence.  Gross negligence consists of an objective and a subjective element.  *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012).  Under Texas law, gross negligence means an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (West 2015).  Risks are "examined prospectively from the perspective of the actor, not in hindsight," *Columbia Medical Center of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008), and an "extreme risk" is

- 27 -

"not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury," *U-Haul Int'l, Inc.*, 380 S.W.3d at 137.  The subjective element requires that the plaintiff show "that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care."  *Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005).

B

BAS maintains that it is entitled to summary judgment dismissing AHS's gross negligence claim because there is "no evidence to raise a genuine issue of material fact as to either element of gross negligence."  BAS Br. (ECF No. 185) at 15.  As this court has previously explained:

> [w]hen a heightened proof standard will apply at trial, that standard controls at the summary judgment stage.  Under Texas law, gross negligence must be proved by clear and convincing evidence.  This standard requires that plaintiffs adduce evidence that is "sufficient to make the existence of the facts highly probable," not merely evidence that is "sufficient to make the existence of fact more probable than not, as required by the preponderance standard."  Therefore, the proof must be "sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established."

*Perez Librado v. M.S. Carriers, Inc.*, 2004 WL 1490304, at *2 (N.D. Tex. June 30, 2004) (Fitzwater, J.) (citations omitted).  Because AHS has failed to adduce evidence sufficient to raise a genuine issue of fact with respect to the subjective element of its gross negligence claim, BAS is entitled to summary judgment dismissing this claim.

Plaintiffs rely on an April 11, 2017 email exchange between BAS Quality Director

Ralph Smith ("Smith") and Senior Air Safety Investigator Michael Lemay ("Lemay") to contend that "BAS knew that if the hangar doors at the facility were left open, there was a likelihood serious damage could be caused to aircrafts stored inside, including AHS's aircraft." Ps. Br. (ECF No. 197) at 20. But the evidence that plaintiffs cite would not enable a reasonable jury to find that any particular BAS employee had a subjective awareness of the risks involved in opening the hangar doors and proceeded with conscious indifference. In fact, both Smith and Lemay acknowledge in their emails that leaving the hangar doors open was likely the result of inadvertence on the part of BAS's employees. While Lemay noted that "jacking in a closed door is basic knowledge among maintenance personnel," he stated:

> I suspect that a contributing factor at play in this incident is that the aircraft was already jacked when the doors were opened. If you are preparing to jack the aircraft, then your knowledge about the procedure would likely lead you to ensure that all conditions (i.e. doors closed) are right before going ahead. However, with an aircraft already jacked and sitting in the corner, it is less likely that a person opening the door would be prompted to think of the risk to the jacked aircraft due to opening the door.

Ps. App. (ECF No. 199) at 139. In response, Smith noted that "[t]here is actually a wind awareness placard on the doors at the Dallas Facility," but he agreed with Lemay that there were likely "'Human Factors' at play," noting that "when you are on focused mission to move aircraft, sometimes the team members 'can't see the Forrest for the trees.'" *Id*. The observations of both Smith and Lemay would only permit a reasonable jury to find that BAS's employees acted with ordinary negligence, not that any particular BAS employee had subjective knowledge of the risk involved in opening the hangar doors when a jacked aircraft

was inside, yet acted with conscious indifference to that risk.

Plaintiffs next contend that "BAS knew that if an Aircraft was improperly lifted onto hydraulic jacks, and improperly ballasted, ignoring published Maintenance Manual instructions, there was an extreme degree of risk that serious damage could be caused to that Aircraft, especially, if, in addition to improperly jacking the Aircraft, the hangar doors are left open to subject the Aircraft to wind gusts." Ps. Br. (ECF No. 197) at 21. In support, they cite the Aircraft's maintenance manual ("Manual"), which instructs users to "[p]ark the aircraft in a closed hangar"[14] when "Lifting . . . the Complete Aircraft with Jacks." Ps. App. (ECF No. 199) at 317-18. But this instruction is alone insufficient to enable a reasonable jury to find that any BAS employee had subjective knowledge of the risk involved in opening the hangar doors when a jacked aircraft was inside, yet acted with conscious indifference to that risk.

Plaintiffs also maintain that BAS failed to properly jack and ballast the Aircraft and failed to use the Manual as required. But the evidence they cite in support—BAS's April 12, 2017 "Executive Summary"—concludes that "Technical data for the jacking and down jacking was not being utilized at the time of maintenance," and that "Technical data for the installation of the nose ballast weight was not being utilized at the time of the install." Ps. App. (ECF No. 199) at 149. This evidence would not permit a reasonable jury to find that

_____

[14]Plaintiffs contend that the Manual states: "All hangar doors are closed (aircraft are to be lifted/lowered in a closed facility only)." Ps. Br. (ECF No. 197) at 21 (citing Ps. App. (ECF No. 199) at 316-18). The court was unable to locate the quoted language on the cited pages of plaintiffs' appendix.

any particular BAS employee was subjectively aware of, but consciously disregarded, the jacking instructions provided in the Manual, or that, prior to the Incident, any BAS employee knew that the Aircraft had been improperly jacked.

Plaintiffs rely extensively on the declaration of their expert, Pat Duggins ("Duggins"), to contend that, for all major repairs and alterations that BAS performed (other than the replacement of the forward fuselage belly skin), BAS made no effort to report continued airworthiness requirements; that BAS had a duty to supervise Bombardier's repair work, and, following the Incident, acts and omissions by Bombardier and BAS damaged the ribs of the aircraft, requiring fabrication of new ribs; that BAS installed at least five major areas of repairs, but was not certified or approved to fabricate wing ribs such as it installed in the Aircraft's left wing; that BAS's acts and omissions caused the Aircraft's symmetry and alignment to be irreparably and substantially changed; and that BAS never properly repaired/restored the Aircraft to type-design or any facsimile thereof, and that, other than symmetry and alignment work, BAS failed to return the repairs, maintenance, inspection, and other work provided to service.  Assuming *arguendo* that the economic loss rule does *not* bar AHS's repair-based gross negligence claim, and accepting the factual observations and conclusions in Duggins' expert report as true, a reasonable jury could not find based on this evidence that, in connection with Bombardier's repair work (which plaintiffs allege BAS supervised), there was any particular "extreme risk" of serious injury, that BAS was subjectively aware of such risk, or that BAS acted with conscious indifference to the rights, safety, or welfare of others.

- 31 -

Accordingly, because plaintiffs have failed under the heightened clear and convincing evidence standard to create a genuine issue of material fact at least with respect to the subjective element of gross negligence, the court grants BAS's motion for summary judgment on this claim.

## VI

BAS moves for summary judgment on AHS's breach of implied bailment claim, contending, *inter alia*, that  AHS cannot meet the first element of the claim: delivery of the Aircraft by AHS to BAS.[15]

## A

BAS maintains that an essential element of a bailment is delivery of the property by the bailor to the bailee; that without such delivery there can be no bailment; that it is undisputed that AHS did not deliver the Aircraft to BAS; that AHS could not have delivered the Aircraft because it was merely the "Owner Trustee" and did not have any right to use or possess the Aircraft and did not have an obligation to maintain it; and that "[b]ecause AHS did not deliver the Aircraft to BAS, 'there can be no bailment' between AHS and BAS." BAS Br. (ECF No. 185) at 18 (citation omitted).

Plaintiffs respond that AHS constructively delivered the Aircraft to BAS when, in response to an April 18, 2017 email from BAS's counsel providing Ruiz, AHS's owner and manager, with a proposal for repair work and asking for consent to perform repairs on the

---

[15]BAS also maintains that the claim has been effectively abrogated by CH300's contract with BAS.  The court need not address this ground.

Aircraft, "AHS gave consent to BAS in order for BAS to perform the Repair Work." Ps. Br. (ECF No. 197) at 25.

BAS replies that plaintiffs have failed to provide any evidence to support their contention that Ruiz was the "owner and manager of AHS"; that Ruiz is the sole member and manager of Mountain High and was, in fact, offered as the corporate representative of Mountain High in this litigation; that the April 18, 2017 email is not evidence of BAS's seeking approval from AHS, but is, instead, evidence that BAS was seeking approval for the repair work from Mountain High as CH300's agent; that the operating agreement between CH300 and AHS granted CH300 (not AHS) the exclusive right to possess, use, and operate the Aircraft and therefore, it could only be CH300, not AHS, who could deliver the Aircraft to BAS; that the evidence conclusively establishes that CH300, through its agent, Ruiz of Mountain High, was responsible for any "delivery" for maintenance; and that the record shows that the Aircraft was actually delivered by CH300 to BAS, "and no vague email can change the delivering party from CH300 to AHS." BAS Reply (ECF No. 201) at 11.

B

Assuming *arguendo* that AHS's breach of implied bailment claim is not barred by the economic loss rule, the court holds that BAS is entitled to summary judgment dismissing this claim. This is so because AHS has failed to introduce sufficient evidence to enable a reasonable jury to find that it delivered the Aircraft to BAS.

As explained above, to create a bailment under Texas law, there must be

> (1) delivery of personal property from one person, the bailor, to another, the bailee, for a specific purpose; (2) acceptance of delivery by the bailee; (3) an express or implied contract between the parties that the specific purpose will be realized; and (4) an agreement between the parties that the property will be either returned to the bailor or dealt with according to the bailor's direction.

*$281,420.00 in U.S. Currency*, 312 S.W.3d at 551. "An essential element of a bailment is delivery of the property by the bailor to the bailee and without such delivery there can be no bailment." *Ragland v. Allright Parking, Inc.*, 559 S.W.2d 858, 859 (Tex. Civ. App. 1977, no writ); *see also Prime Products, Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 638 (Tex. App. 2002, pet. denied) ("A bailment relationship results from a contract under which bailed goods are delivered *by the bailor* and accepted by a bailee for a specific purpose." (emphasis added) (citing *E.L. Smith v. Radam, Inc.*, 51 S.W.3d 413, 417 (Tex. App. 2001, no pet.))); *Panhandle S. Plains Fair Ass'n v. Chappell*, 142 S.W.2d 934, 935 (Tex. Civ. App. 1940, no writ) ("[I]n order to effect a bailment it is essential that a delivery of the property or article involved in the bailment be made to the bailee by the bailor.").[16]

A reasonable jury could not find from the summary judgment evidence that AHS constructively delivered the Aircraft to BAS following the Incident. The only evidence that

_____

[16]The parties appear to agree that Texas law requires that the party seeking to recover on a bailment claim must establish that it actually or constructively delivered the property at issue to the bailee, and that a plaintiff cannot recover on a bailment claim when a third-party who is not acting as an agent for the bailor delivers the bailed property. *See* BAS Br. (ECF No. 185) at 18 ("Because AHS did not deliver the Aircraft to BAS, there can be no bailment between AHS and BAS." (citation and internal quotation marks omitted)); Ps. Br. (ECF No. 197) at 25 (arguing that constructive delivery of the Aircraft "occurred when AHS gave consent to BAS in order for BAS to perform the Repair Work.").

AHS cites in support of its constructive delivery argument is the April 18, 2017 email from

Aaron Disney ("Disney") to Ruiz, which states, in pertinent part:

> Please find attached Bombardier's damage assessment and repair proposal for Challenger 300-20040. We appreciate your client's patience as we carefully evaluated the incident occurring on March 29th 2017, along with the resulting damage to the aircraft, and the necessary repairs. . . . At this point we would like to begin work on the repair proposal as soon as possible upon your client's consent. We are currently estimating a return to service date of August 1, 2017. Please be advised that this date is only an estimate as there remain some areas that will require additional investigation as indicated in the proposal after repair has commenced.

Ps. App. (ECF No. 199) at 146. But this evidence is alone insufficient to support AHS's

conclusory allegation that "AHS gave consent to BAS in order for BAS to perform the

Repair Work." Ps. Br. (ECF No. 197) at 25. AHS has not introduced any evidence that

AHS, as opposed to CH300 or Mountain High, was the entity that ultimately consented to

the repair work. And because a reasonable jury could not find on the basis of Disney's April

18, 2017 email alone that AHS constructively delivered the Aircraft to BAS by consenting

to the repair work, the court grants BAS's motion for summary judgment on AHS's breach

of implied bailment claim.

## VII

The court now considers whether BAS is entitled to summary judgment dismissing

CH300's DTPA claim against BAS.

### A

"A plaintiff must be a 'consumer' to maintain a private action under the DTPA."

*Eckman v. Centennial Sav. Bank*, 784 S.W.2d 672, 674 (Tex. 1990) (citing *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 388 (Tex. 1982)).  The DTPA defines a consumer as:

> an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, *except that the term does not include a business consumer* that has assets of $25 million or more, or *that is owned or controlled by a corporation or entity with assets of $25 million or more*.

Tex. Bus. & Com. Code Ann. § 17.45(4) (West 2021) (emphasis added).  The term '[b]usiness consumer' means an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use.  The term does not include this state or a subdivision or agency of this state."  *Id.* § 17.45(10).  "Thus, business consumers, whether individuals or businesses, with assets of $25,000,000 or more are excluded from DTPA coverage."  *Eckman*, 784 S.W.2d at 674.  "The defendant has the burden to plead and prove the applicability of the $25,000,000 exception to business consumer status as an affirmative defense."  *Id.* at 674-75; *see also Hybrid Energy Servs., Ltd. v. Magness Oilfield Brokerage, LLC*, 2016 WL 11673473, at *2 (N.D. Tex. Aug. 5, 2016) (Cummings, J.) (noting that "the $25-million-dollar exception is an affirmative defense that must be pleaded and proved by the DTPA defendant." (citation omitted)).

## B

BAS contends that CH300's DTPA claim is barred on the basis that CH300 is a business consumer that is owned and controlled by Ricardo Orrantia ("Orrantia"), who

- 36 -

qualifies under the statute as an entity with assets of $25 million or more because his net worth exceeds $25 million; all of the maintenance and operations expenses necessary to operate the Aircraft were "funded" by Orrantia, who was CH300's "sole member," "the evidence conclusively establishes (1) the goods or services CH300 purchased from BAS was for commercial or business use, and (2) CH300 is owned and controlled exclusively by Ricardo Orrantia, whose net worth exceeds $25 million," BAS Br. (ECF No. 185) at 16; and that CH300 cannot avoid "business consumer" status by hiding behind corporate formalities and asset transfers within a related group of individuals or companies.

Plaintiffs respond that the exception to the definition of a consumer is that a business consumer cannot be owned or controlled by a corporation or entity with assets in excess of $25 million and that Orrantia, regardless of his net worth, is neither a corporation nor an entity.

## C

The DTPA does not define the term "entity" in § 17.45(4).  And Texas law has not developed sufficiently for the court to reasonably conclude that Orrantia qualifies as an "entity" within the meaning of the statute.  This is so even though it may be reasonable to interpret the term "entity" in § 17.45(4) as a shorthand reference to an "individual" or "partnership," each of which, together with a "corporation," *is* included in the definition of "Business consumer" found in § 17.45(10).  But because BAS must establish the exception to consumer status as an affirmative defense beyond peradventure, and the law is unsettled, the court will deny summary judgment dismissing CH300's DTPA claim on the basis that

- 37 -

CH300 is barred from qualifying as a consumer based on Orrantia's status. The court will be able to revisit this question, if necessary, at or after trial on motion for judgment as a matter of law.

## VIII

The court next considers whether BAS is entitled to summary judgment limiting CH300's recovery for breach of contract on the ground that the Work Order Terms and Conditions limit CH300's recoverable damages.

## A

BAS contends that CH300's claims for all potential recoverable damages, including the diminution of value or difference in sales price of the Aircraft and its component parts, such as its engines, are subject to the "Limitation of Liability" provision in the Work Order Terms and Conditions; that CH300 cannot recover more than "the price allocable to the work, good, or part thereof which gives rise to the claim," BAS Br. (ECF No. 185) at 20 (quoting BAS App. (ECF No. 186) at 20)); that although the ultimate amount of the prospective damages is yet to be determined, the court should hold as a matter of law that plaintiffs' damages cannot exceed an amount equal to the sum of the contracted-for work and the price of any repairs to correct any damages caused; and that to the extent plaintiffs seek to recover exemplary damages in connection with CH300's contract claim, exemplary damages cannot be recovered on a contract claim, particularly where, as here, the contract expressly prohibits the recovery of "punitive damages."

Plaintiffs respond that the Limitation of Liability provision in the Work Order Terms

- 38 -

and Conditions only applies in the context of the limited warranty and does not limit non-warranty-related liability; that the warranty defines and limits the scope of damages that fall within its application; that two prerequisites must be satisfied for damages to fall under the warranty—(1) the damages must arise out of defects in materials or workmanship, and (2) the damages must have arisen after the aircraft is returned to service or otherwise after it has been delivered to the customer—and neither prerequisite is satisfied in this case because the substantial damages to the Aircraft that are the subject of this lawsuit did not arise out of any defect in material or workmanship but, instead, arose out of the negligence of BAS's employees and, furthermore, the damages occurred before the Aircraft was ever returned to service; and that even if the Limitation of Liability provision applies, it does not limit liability to the sum of the contracted-for work plus the price of repairs, as BAS contends, but, instead, limits BAS's liability to the price of the "GOOD," which, in this case, would be the price of the Aircraft.

BAS replies that, by its terms, the Limitation of Liability provision is not limited to "warranty" claims but is, instead, broad in nature, limiting BAS's potential damages to multiple types of claims and any damage that could be linked or connected with its performance; that it would be nonsensical to interpret the Limitation of Liability provision to mean that BAS did not warrant against defects in materials or workmanship while the work was being conducted; that the placement of the Limitation of Liability provision within the warranty section of the Work Order Terms and Conditions cannot be used to limit its scope because the court must consider each provision as it relates to the entire agreement;

that plaintiffs provide no support for the concept that a contractual limitation of liability is only applicable when the contract's warranty procedures are invoked; and that plaintiffs' attempt to characterize the Limitation of Liability provision as applying to the price of the Aircraft itself is untenable because the contract did not concern the sale of an aircraft but, instead, concerned maintenance, which falls within the category of "WORK," and "[a]n interpretation limiting the damages to the full value of the Aircraft, which was not sold by BAS for that or any other value, undermines both the clause in question and the nature of the parties' agreement," BAS Reply (ECF No. 201) at 17.

B

Under Texas law,[17]

> the court's primary concern when interpreting a contract is to ascertain the parties' intentions as expressed objectively in the contract.  In doing so, the court must examine and consider the entire writing in an effort to harmonize and give effect to all contractual provisions, so that none will be rendered meaningless.  Language should be given its plain and grammatical meaning unless it definitely appears that the parties' intention would thereby be defeated.  Where the contract can be given a definite legal meaning or interpretation, it is not ambiguous, and the court will construe it as a matter of law.

*Klein v. Fed. Ins. Co.*, 220 F.Supp.3d 747, 756 (Fitzwater, J.) (N.D. Tex. 2016) (citations omitted), *aff'd*, 714 Fed. Appx. 441 (5th Cir. 2018).  If, on the other hand, "a contract is

---

[17]The Work Order Terms and Conditions provide that it is to be interpreted in accordance with the laws of the state in which the BAS facility is located that is performing the work, i.e., Texas.  *See* BAS App. (ECF No. 186) at 20, art. 12.

found to be ambiguous, the interpretation of the contract becomes a fact issue." *Burlington*

*N. & Santa Fe Ry. Co. v. S. Plains Switching, Ltd.*, 174 S.W.3d 348, 358 (Tex. App. 2005,

no pet.) (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).  A contract is ambiguous

"if it is subject to 'two or more reasonable interpretations after applying the pertinent rules

of construction.'"  *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 781 (Tex. 2006) (orig.

proceeding) (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d

587, 589 (Tex. 1996)).  "Whether a contract is ambiguous is a question of law for the court

to decide by looking at the contract as a whole, in light of the circumstances present when

the contract was entered."  *Orthoflex, Inc. v. ThermoTek, Inc*., 2013 WL 4045206, at *3

(N.D. Tex. Aug. 9, 2013) (Fitzwater, C.J.) *aff'd sub nom. Motion Med. Techs., L.L.C. v.*

*Theromtek, Inc.*, 875 F.3d 765 (5th Cir. 2017).

C

The "Limitation of Liability" provision of the Work Order Terms and Conditions

provides:

> Customer acknowledges that the prices BAS has agreed to charge customer for the goods and services covered by this Agreement have been agreed upon by BAS in reliance upon Customer's agreements limiting BAS' liability set forth above and below, and that without such agreements, BAS would be unwilling to provide such products and services for the price and other terms set forth herein.  BAS' LIABILITY ON ANY CLAIM OF ANY KIND, INCLUDING BREACH OF CONTRACT OR WARRANTY OR FOR NEGLIGENCE OR OTHER CONDUCT, FOR ANY LOSS OR DAMAGE ARISING OUT OF, CONNECTED WITH, OR RESULTING FROM THIS DELIVERY, RESALE, OR REPAIR OF ANY GOODS COVERED BY OR FURNISHED UNDER THIS

- 41 -

AGREEMENT SHALL IN NO CASE EXCEED THE PRICE ALLOCABLE TO THE WORK, GOOD, OR PART THEREOF WHICH GIVES RISE TO THE CLAIM.   IN NO EVENT SHALL BAS BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL   OR   PUNITIVE   DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS.

BAS. App. (ECF No. 186) at 20, art. 9.

There are at least two reasonable interpretations of this provision.  The first is that the Work Order Terms and Conditions only limit BAS's liability in the context of warranty claims.  In other words, if a contracting party brings a warranty claim (whether styled as a claim for breach of warranty, breach of contract, or otherwise), BAS's liability is limited to "the price allocable to the work, good, or part thereof"; for all other claims (i.e., non-warranty claims), BAS's liability is not contractually limited.  This interpretation, which plaintiffs advance, is supported by both the placement of the Limitation of Liability provision within the Work Order Terms and Conditions and by the language of the provision itself.

The "Limitation of Liability" provision is contained within Article 9 of the Work Order Terms and Conditions under the heading "Warranty."  The four sub-parts directly preceding the Limitation of Liability provision relate only to the warranty:  Section A sets forth the general scope of BAS's warranties; Section B details the terms and conditions; Section C addresses limitations and exclusions to the warranties; and Section D states that there are no other warranties/representations.  *See id.*  A reasonable reading of Section E, the "Limitation of Liability" provision, is that this section, like the four preceding sections, applies only within the context of BAS's warranty and describes the limitations of liability

- 42 -

with respect to warranty claims.  Had BAS intended to limit its liability for *all* claims, there would have been no logical reason to include the Limitation of Liability provision within Article 9.

Moreover, the language used by the Limitation of Liability provision supports the reasonable conclusion that liability is only limited within the context of warranty claims. BAS generally warrants against various defects in materials and workmanship. *See id.* at art. 9, sec. A.  A reasonable reading of the Limitation of Liability provision is that BAS used the phrase "WORK, GOOD, or PART" to refer back to the specific defects in workmanship (i.e., "WORK") or materials (i.e., "GOOD" or "PART") that it warranted against.

But there is a second reasonable interpretation of the Limitation of Liability provision, which BAS advances.  This interpretation is that, although the Limitation of Liability provision is contained within Article 9, its scope is intended to apply beyond the terms of the limited warranty as set forth in Article 9, sections A through D.  This interpretation is reasonable because the Limitation of Liability provision uses language that limits BAS's liability for "*any claim of any kind*, including breach of contract or warranty or for negligence or other conduct." *Id.* (capitalization omitted)*.*  If BAS had intended to limit only warranty claims to "the price allocable to the work, good, or part thereof," it could have specified that intent by limiting its liability for "breach of warranty" claims.  Instead, by broadly referring to "any claim of any kind," including non-warranty claims such as breach of contract or negligence, BAS made clear its intent to limit its liability for all types of claims—not just warranty claims—arising out of its performance under the agreement. *Id.*

- 43 -

(capitalization omitted).

Because there are at least two reasonable interpretations of the Limitation of Liability provision—i.e., that it limits liability for *all claims* or that it limits liability *for only warranty claims*—the court concludes that the Work Order Terms and Conditions are ambiguous on their face.  Accordingly, the court denies BAS's motion for summary judgment seeking to establish that the damages recoverable for CH300's breach of contract claim are limited to the price allocable to the work, good, or part thereof that gives rise to the claim.  *See, e.g., APS Cap. Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272 (5th Cir. 2009) (holding that district court erred when it resolved case at summary judgment where contract was ambiguous on its face); *Childers v. Pumping Sys., Inc.*, 968 F.2d 565, 571 (5th Cir. 1992) ("When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument is a question of fact for the jury" (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987))).[18]

IX

The court now considers plaintiffs' motion for summary judgment on BAS's breach of contract counterclaim.

_____

[18]Because the court has concluded that the Work Order Terms and Conditions are ambiguous with respect to the "Limitation of Liability" provision, it need not address whether the prerequisites to recovery under BAS's warranties have been satisfied, or whether, if the Limitation of Liability provision *does* apply, BAS's liability is limited in this case to the sum of the contracted-for work plus the price of any repairs.

- 44 -

A

BAS seeks to recover from AHS and CH300 "Aircraft Storage Fees" of $1,000 per day, beginning November 1, 2018, based on the following provisions in the Bombardier Aircraft Service Centers Proposal Terms and Conditions ("Proposal Terms and Conditions"):

> Customer will be charged a storage fee of $1,000 "per day" for the following:
>
> A.    Aircraft "returned to service" that remain at the facility for more than 24 hours.
>
> B.    Idle time following the completion of an aircraft inspection or examination while awaiting customer approval of work or corrective action.   In these circumstances, idle time:
>
> i.    Starts when a list of findings and/or corrective actions have been submitted to the customer or upon closing a work order and ends upon receiving approval for work of sufficient magnitude to occupy 8 techs total for 2 complete shifts or when aircraft is returned to customer.
>
> ii.    BAS may store the aircraft outside of the hangar during idle times.
>
> iii.    Idle time will not be charged to the customer if caused by BAS.

Ps. App. (ECF No. 119) at 47, art. 11.  Regarding return of the Aircraft to airworthiness, the Proposal Terms and Conditions state:

> BAS will comply with the applicable airworthiness inspection requirements and/or test the systems installed or modified.  FAR 91.213 requires US registered turbojet aircraft coming out of an inspection to have all systems operational before returning to service, or exemption provided for by virtue of a minimum equipment list.  Aircraft may depart on a ferry permit provided aircraft is safe for intended flight.

*Id.*, art. 17.

- 45 -

B

Plaintiffs move for summary judgment on BAS's breach of contract counterclaim against AHS on the ground that there is no written agreement between BAS and AHS on which this claim can be based. BAS does not oppose plaintiffs' motion in this respect. The court therefore grants summary judgment dismissing BAS's breach of contract counterclaim to the extent asserted against AHS.

C

Plaintiffs also move for summary judgment on BAS's breach of contract counterclaim asserted against CH300 on the ground that BAS is not entitled to storage fees under the Proposal Terms and Conditions. Plaintiffs contend that, although CH300 did initially bring the Aircraft to BAS for maintenance and inspection work, the Aircraft remained in BAS's possession well beyond the expected duration of maintenance work for no other reason than because BAS damaged the Aircraft; that the only contractual agreement on record in this case is for the performance of maintenance and inspection work, and neither AHS nor CH300 agreed to storage fees for any other terms and conditions as they pertain to BAS's protracted and failed attempts to repair the Aircraft; that plaintiffs are not liable for the amounts of storage fees accrued since October 2018 because BAS failed to meet the conditions necessary to charge plaintiffs for "idle time"; that "idle time" and, consequently, storage fee penalties, cannot begin until BAS has completed its work on the Aircraft and complied with all Federal Aviation Regulations necessary to release the Aircraft back to service, and the summary judgment evidence shows that BAS did not meet its obligation to complete all work on the

- 46 -

Aircraft before it began penalizing plaintiffs for storage fees; that the evidence shows that BAS continued to perform work on the Aircraft well into 2020; that plaintiffs were not obligated to take possession of the Aircraft when it was in significantly poorer condition (and in non-airworthy condition) than it was in when CH300 delivered it to BAS for maintenance; that BAS did not notify plaintiffs in October 2018 that repairs on the Aircraft were "substantially complete" and that plaintiffs should take possession of the Aircraft; that the only communication in October 2018 was a settlement discussion in which BAS mentioned its ongoing work on the Aircraft and discussed conditions for settlement; and that BAS did not present any invoices for storage fees until December 2020, which demonstrates that even BAS did not appreciate that any storage fees were accruing because the work on the Aircraft was incomplete.

BAS responds that there is a genuine issue of material fact on BAS's breach of contract counterclaim for storage fees against CH300; that although the primary purpose of the contract between CH300 and BAS was to perform the maintenance in question, the contract as a whole contained a number of other provisions that created obligations on the part of both parties; that CH300 is not seeking storage fees dating back to when the Incident occurred but is, instead, only seeking fees for the period after the Aircraft was repaired and plaintiffs were notified of its ability to be returned to service in October of 2018; that a genuine issue of material fact exists on whether BAS has met the conditions precedent to charge storage fees to CH300; that CH300 actively refused to allow BAS to take actions that would permit the Aircraft to be "returned to service" by refusing permission to conduct a test

flight or accept the Aircraft; that BAS's counterclaim accordingly relies on Subsection 11(B) for "idle time," which begins "following the completion of an aircraft inspection or examination while awaiting customer approval of work or corrective action," BAS Br. (ECF No. 125) at 13 (quoting BAS App. (ECF No. 113) at 17); that the evidence shows that a "corrective action" was "submitted to the customer" when BAS's counsel informed plaintiffs' counsel on October 15, 2018 that a test flight was necessary to return the Aircraft to service; that plaintiffs refused to permit the test flight to go forward; that the fault for the Aircraft's not being returned to service rests entirely with plaintiffs, and once they declined, as BAS's counsel informed them, storage charges began accruing; that it is not necessary that BAS comply with the applicable Federal Aviation Regulations before charging for idle time because under § 17(A) of the Proposal Terms and Conditions, idle time can apply when there is *any* corrective action that the customer has not approved; that the maintenance performed on the Aircraft in May and June of 2020 was solely to preserve the Aircraft and its engines, comply with any new periodic inspections, or comply with client requests and did not involve repairing any damage or completing any task involved in the previous work orders; that the damage repairs were completed as of October 31, 2018, when the Repair Order was closed; that plaintiffs' notice argument fails because they admit that they received a letter from BAS's counsel on October 15, 2018 that stated that the Aircraft was ready to be returned to service upon a test flight, and that if that was not authorized by the owner, "then BAS will tender the aircraft to the owner at the BAS facility in its then current condition, *with all storage/hangar expense and risk of loss subsequently to be borne by the owner*," *id.* at 15

- 48 -

(bold font omitted) (quoting BAS App. (ECF No. 113) at 183); that a subsequent communication on November 1, 2018 confirmed to plaintiffs that the Aircraft could be accepted and returned to service even without a test flight; that Fed. R. Evid. 408 does not preclude BAS from relying on the October 15, 2018 letter to establish that plaintiffs were put on notice that they needed to retrieve their Aircraft, thus invoking the relevant provision of the contract; and that the fact that invoices were not sent until a certain time does not negate the claim under Texas law, especially where, as here, there is no conditional language in the contract that would establish the requirement of invoicing as a condition precedent.

## D

"[W]hen the facts of the parties' conduct are undisputed or conclusively established," the question "[w]hether a party has breached a contract is a question of law for the court." *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (citing *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971)). But "insofar as a dispute exists concerning the failure of a party to perform the contract," the court "submits the disputed fact questions to the jury." *LaFarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 186 (Tex. App 1998, pet. denied) (citation omitted); *see also Kellermann v. Avaya, Inc*., 530 Fed. Appx 384, 388 (5th Cir. 2013) (per curiam) ("The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury." (quoting *Meek v. Bishop Peterson & Sharp, P.C.* 919 S.W.2d 805, 808 (Tex. App. 1996, writ denied))). "In other words, '[w]hile the factual determination of what actions were taken is for the fact finder, whether those actions constitute a breach of

contract is a question of law for the court.'" *Kellermann*, 530 Fed. Appx. at 388 (quoting *In re Cano Petrol. Inc.*, 277 S.W.3d 470, 473 (Tex. App. 2009, orig. proceeding)).

Here, there is conflicting evidence regarding BAS's satisfaction of (or failure to satisfy) the conditions precedent[19] to CH300's owing storage fees under the Proposal Terms and Conditions. For example,[20] there are disputed issues of material fact regarding whether and when BAS notified plaintiffs that repairs on the Aircraft were "substantially complete," whether and for how long BAS was in possession of the Aircraft while awaiting customer approval of "corrective action," and whether and when BAS actually completed its repairs on the Aircraft. This conflicting evidence creates a material fact issue regarding whether BAS fulfilled the conditions precedent under the contract. Accordingly, plaintiffs are not entitled to summary judgment dismissing BAS's breach of contract counterclaim. *See, e.g., Munoz v. State Farm Lloyds*, 2006 WL 89836, at *3 (S.D. Tex. Jan. 13, 2006) (denying motion for summary judgment on breach of contract claim where "conflicting evidence creates a material question of fact regarding whether Plaintiffs fulfilled their conditions

---

[19]"Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976); *see also Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) ("A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." (citation omitted)).

[20]As stated above, "[w]hen this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho*, 658 F.Supp.2d at 812 n.8 (citing *Swicegood*, 2003 WL 22234928, at *17 n.25).

precedent under the contract.").

X

BAS moves for summary judgment as to plaintiffs' claim for exemplary damages based on lack of evidence and on the basis that such damages are unavailable because plaintiffs' only surviving claims are those based in contract.  The court grants BAS's motion.

The SAC seeks exemplary damages only in connection with plaintiffs' claim for gross negligence.  *See* SAC ¶ 25.  Because AHS is barred under the economic loss rule from recovering against Bombardier on its claim for negligence and gross negligence, and AHS's gross negligence claim against BAS has been dismissed, AHS is not entitled to recover exemplary damages.

*   *   *

Accordingly, for the reasons explained, the court grants Bombardier's motion for summary judgment and dismisses the action against it with prejudice by Rule 54(b) final judgment filed today.  The court grants in part and denies in part BAS's motion for partial summary, and it grants in part and denies in part plaintiffs' motion for partial summary judgment.

**SO ORDERED**.

February 23, 2022.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 51 -