IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

AIRCRAFT HOLDING SOLUTIONS, §
LLC, §
§
        Plaintiff, §
§       Civil Action No. 3:18-CV-0823-D
and §
§
CH300, LLC, §
§
        Plaintiff-counterdefendant, §
§
VS. §
§
LEARJET, INC. d/b/a BOMBARDIER §
AIRCRAFT SERVICES (BAS), §
§
        Defendant-counterplaintiff. §

## <u>MEMORANDUM OPINION</u>

This is a removed action that arises from damage to a 2005 Bombardier Challenger

300 aircraft ("Aircraft") that occurred when it fell off its jacks during routine periodic

maintenance and inspection. Plaintiff Aircraft Holding Solutions, LLC ("AHS"), the Aircraft

owner, sues defendant-counterplaintiff Learjet, Inc. d/b/a Bombardier Aircraft Services

("BAS"), the repair company, for negligence, and plaintiff-counterdefendant CH300, LLC

("CH300"), the Aircraft operator, sues BAS for breach of contract and violation of the Texas

Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code

Ann. §§ 17.41-17.63 (West 2021). BAS counterclaims against CH300 for breach of contract

and quantum meruit.  Following a bench trial, and for the reasons that follow,[1] the court holds that AHS proved that BAS was negligent but failed to prove its diminution-in-value measure of damages, so BAS is entitled to judgment in its favor on that claim; CH300 failed to prove that BAS violated the DTPA; CH300 is entitled to recover loss-of-use damages on its breach of contract claim; BAS is entitled to recover the unpaid balance of the sum that CH300 owes under the parties' contract for 144-month inspection and maintenance services; and BAS is entitled to recover preservation-related damages on its quantum meruit counterclaim against BAS.

I

CH300 is a Florida limited liability company whose sole member is Ricardo Orrantia, a Mexican citizen.  On May 22, 2015 CH300 purchased the Aircraft for $9.3 million.  To comply with Federal Aviation Administration ("FAA") registration requirements,[2] CH300 immediately conveyed title to the Aircraft to AHS, as trustee.[3]  Although under the terms of a May 18, 2015 Operating Agreement CH300 retained the "exclusive license to possess, use

---

[1]The court sets out in this memorandum opinion its findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).  All factual findings are based upon a preponderance of the evidence, which means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in the court's mind as the trier of fact a belief that what is sought to be proved is more likely true than not true.  To prove a claim or defense by a preponderance of the evidence merely means to prove that the claim or defense is more likely so than not so.

[2]Federal law prohibits companies owned by foreign individuals from registering an aircraft with the FAA.  *See generally* 14 C.F.R. § 47.1-.19.

[3]Although AHS held title to the Aircraft as trustee, the court for simplicity will refer to AHS as the Aircraft owner.

and operate [the Aircraft]," D. Ex. 3, AHS was the registered owner until the Aircraft's sale on March 17, 2021.

On February 7, 2017 CH300[4] and BAS executed a proposal ("Proposal") for routine maintenance and 144-month inspection services to be performed on the Aircraft. The Proposal stated, *inter alia*, that "[s]ignature below indicates your acknowledgment of the Bombardier Aircraft Services Proposal as well as the Proposal & Work Order Terms and Conditions." D. Ex. 1 at 9.

CH300 delivered the Aircraft to BAS's Dallas facility on March 28, 2017 and signed Aircraft Work Order 198284 ("Work Order"), which authorized BAS to perform 144-month inspection services and maintenance on the Aircraft. The Work Order incorporated the Proposal by reference and also incorporated the Bombardier Aircraft Service Center Work Order Terms and Conditions ("Work Order Terms and Conditions").

The following day, on March 29, 2017, while BAS was performing maintenance under the Work Order, the Aircraft fell off its maintenance jacks (the "Incident") and sustained extensive damage.

BAS notified CH300 about the Incident and offered to replace the affected areas of the Aircraft. BAS contracted with Bombardier, Inc. ("Bombardier")[5] to repair the Aircraft.

---

[4]CH300 acted through its agent, Mountain High Aviation, LLC.

[5]AHS also sued Bombardier in this lawsuit, but the court entered a Fed. R. Civ. P. 54(b) final judgment in Bombardier's favor on February 23, 2022, after granting Bombardier's motion for summary judgment. *See Aircraft Holding Sols., LLC v. Learjet, Inc.,* 2022 WL 562760 (N.D. Tex. Feb. 23, 2022) (Fitzwater, J.).

Bombardier then made the repairs under a separate work order, number 198551 ("Repair Order").

On February 19, 2018 AHS and CH300 filed this lawsuit in state court, alleging various state-law claims arising from the Incident and subsequent repair efforts. While the suit was pending, plaintiffs' retained expert, Carl Patrick Duggins ("Duggins"), filed a hotline complaint with the FAA in which he reported the Incident and ongoing repairs and expressed "great concern" regarding the airworthiness of the Aircraft. D. Ex. 27 at 6. In response, the FAA's local office began an investigation.

On October 15, 2018 BAS informed plaintiffs that the damage repairs were almost complete and that, to return the Aircraft to service, a flight test authorized by the owner was required. BAS also advised plaintiffs that "[i]f the owner does not authorize the test flight, then BAS will tender the aircraft to the owner at the BAS facility in its then current condition, with all storage/hangar expense and risk of loss subsequently to be borne by the owner." D. Ex. 9 at 2. In response, plaintiffs disputed the airworthiness of the Aircraft, refused to consent to a test flight, and demanded that BAS continue to store and preserve the Aircraft "to prevent spoliation issues" while the FAA completed its investigation. D. Ex. 10.

BAS signed off on the damage repairs and closed the Repair Order by October 31, 2018. At the same time, BAS completed the 144-month inspection and all services included in the Proposal and closed the Work Order. To avoid further damage to the Aircraft, BAS continued to store the Aircraft at its facility and performed preservation-related maintenance. The Aircraft, however, was not returned to service.

On March 10, 2020 the FAA issued a memorandum concluding, in pertinent part:

> [t]he allegation that [the Aircraft] is "unairworthy" and "unsafe"
> in the context of work performed as a result of the damage from
> falling off the jacks is **not substantiated**.  The aircraft has yet
> to be returned to service after being repaired and is due
> numerous calendar driven inspections, rending the aircraft
> unairworthy until such a time that the required inspections are
> accomplished.

D. Ex. 7 at 6 (emphasis in original).  Shortly thereafter, on March 17, 2021, the Aircraft was sold to Central Connecticut Aircraft, LLC ("Central Connecticut") for $3.4 million.  Central Connecticut completed all of the required maintenance, returned the Aircraft to service, and quickly sold it on September 16, 2021 for $7.2 million before it left the Bombardier facility and as soon as it was available on the market.

In *Aircraft Holding Solutions, LLC v. Learjet, Inc.* (*Aircraft Holding I*), 2022 WL 562760 (N.D. Tex. Feb. 23, 2022) (Fitzwater, J.), the court granted in part and denied in part the cross-motions for summary judgment of BAS and plaintiffs.  The case then proceeded to a bench trial on the following claims: AHS's claim for negligence against BAS; CH300's DTPA and breach of contract claims against BAS; and BAS's counterclaims for breach of contract and quantum meruit against CH300.[6]

---

[6]BAS also asserts a quantum meruit counterclaim against AHS.  *See* Orig. Compulsory Countercl. (ECF No. 74) at 9-10.  But aside from referring to AHS in a heading in its post-trial brief, *see* D. Post-Trial Br. at 24, BAS did not present any argument in the brief as to why it should recover against *AHS* on its quantum meruit claim.  *See id.* at 24-25 (arguing that all four elements of quantum meruit claim are met *as to CH300*).  In fact, BAS barely mentioned its quantum meruit counterclaim at trial, much less focused that claim on AHS. The words "quantum meruit" do not appear in the trial transcript until the final day of trial, during BAS's closing argument.  Tr. 6:29.  And when BAS's counsel did mention

II

The court begins with AHS's negligence claim.  BAS does not dispute that it was negligent.  Instead, it seeks to preclude this claim on the basis that it is barred under Texas law by the economic loss rule.

A

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam) (citations omitted).  Not all tort claims, however, "arising out of a contractual setting" are precluded by the rule.  *Id.*  To determine whether the economic loss rule bars a tort claim, the court must "analyze[] both the source of the duty and the nature of the remedy."  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998).  If "the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit," the economic loss rule does not apply.  *Chapman Custom Homes*, 445 S.W.3d at 718 (citations omitted); *see also Sullivan v. PS Funding Inc.*, 2021 WL 3556958, at *2 (N.D. Tex. July 15, 2021) (Toliver, J.) ("[I]f the defendant's conduct would give rise to liability independent of the fact that a contract exists between the

---

quantum meruit, it was in relation to "plaintiffs" rather than to AHS specifically.  Accordingly, the court concludes that BAS is pursuing its quantum meruit counterclaim against CH300 alone, not AHS.

parties, the plaintiff may bring a tort claim in addition to a claim for breach of contract."), *rec. adopted*, 2021 WL 3553483 (N.D. Tex. Aug. 11, 2021) (Kinkeade, J.).

## B

Largely for the reasons explained in *Aircraft Holding I*, the court holds that the economic loss rule does not bar AHS's negligence claim. *See Aircraft Holding I*, 2022 WL 562760, at *5-6.

### 1

AHS proved at trial that BAS's negligence caused the Incident: its employees improperly jacked the Aircraft and then left the hangar doors open when moving a different aircraft so that a gust of wind was able to enter the hangar and lift the Aircraft off its jacks, causing extensive damage. *See* P. Ex. 15 at 2-3, 9. This negligence breached a common law duty of care that is *independent of* BAS's contractual obligations under the Proposal and Work Order. This is so even if, as BAS argues, "the damage to the Aircraft occurred only because BAS was in the process of performing the Contract." D. Post-Trial Br. 4. As the court explained in *Aircraft Holding I*, "the [economic loss] rule does not apply if a person negligently performs a contract in a way that injures property or persons *incidental to the contract work being done*." *Aircraft Holding I*, 2022 WL 562760, at *6 (alteration in original) (quoting *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 635 (Tex. App. 2020, no pet.)). "BAS's employees' opening the hangar doors to move a *different* aircraft would certainly have been conduct that was incidental to the contract work (i.e., maintenance and inspection services) being done on the Aircraft." *Id.*

(citing *Dixie Carpet Installations*, 599 S.W.3d at 635).

BAS contends that it had a contractual duty not to damage the Aircraft while performing the 144-month inspection, and that its negligence in connection with the Incident breached only this contractual duty. Based on language in the Proposal that states that "price includes . . . Aircraft protection," D. Ex. 1 at 2, BAS maintains that "part of BAS's contractual obligation was to protect the Aircraft from being damaged, including from activities relating to other aircraft in the hangar," and that "both protection of the Aircraft and suspension of the Aircraft on jacks were material to the services CH300 bargained for when it entered into the Contract with BAS." D. Post-Trial Br. 4. The court disagrees.

The Proposal states, in pertinent part, under the "Inspections" section of "Workscope Details":

> Unless otherwise stated, price includes:
> - Labor
> - Associated acceptance runs
> - Removal/installation of aircraft cockpit, external access panels, and floorboards as applicable
> - Sealing of related access panels
> - Paint touch ups
> - Aircraft protection
> - Post inspection related functional tests
> - Quality control and logbook entries
> - Logbook review includes Airworthiness Directives and Life Limited Components
> - Servicing of the lavatory

D. Ex. 1 at 2. Each item on this list constitutes a component of the agreed-upon price and scope of work for BAS's inspection of the Aircraft. Thus under the terms of the Proposal, BAS was required to perform (and was not permitted to charge additional fees for) the listed

items, including, for example, "Aircraft protection."[7]  Nothing in the plain language of the Proposal suggests that by including "Aircraft protection" in the Workscope Details, BAS intended to broadly ensure against any kind of damage to the Aircraft, including damage caused by forces outside of the actual inspection, i.e., negligent conduct *incidental to the inspection itself*.

Regardless, AHS's negligence claim is *not* based on any failure of BAS to adequately "protect" the Aircraft or satisfactorily complete the bargained-for maintenance and inspection services.  *Cf. Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991) (where defendant inadvertently omitted plaintiff's advertisement from Yellow Pages and plaintiff

---

[7]"Aircraft protection" refers to affirmative steps that BAS employees take to protect the Aircraft from being damaged *during the course of the inspection itself*.  As Marc Rivest, Bombardier's Director for Customer Support for the Americas, testified:

> Q.  What kinds — well, what kinds of actions does BAS Dallas take that *fall within aircraft protection*?
> A.  We will protect the aircraft for the — most of the areas we will work on.  We will protect leading edges.  We would protect windows, make sure that nothing is damaged as we work on the aircraft.  We will pay attention to the zones we're going to work in.  As to the interior we would protect side walls, we would protect bulkheads, we would protect the carpet.  If it's on the exterior, we would protect even more the areas we would work on.  If we walk on the wings, we would put mats.  That kind of thing.
> Q.  So it is a number of actions that they do to ensure that the aircraft is not damaged?
> A.  Correct.
> Q.  And the price includes that?
> A.  Correct.

Tr. 4A:132 (emphasis added).

sued for negligence, economic loss rule applied because the "duty to publish [plaintiff's] advertisement arose solely from the contract" and plaintiff's damages "were only for the economic loss caused by [defendant's] failure to perform.").  In fact, even assuming that BAS had fully complied with all of the terms in the Proposal and Work Order—i.e., it had satisfactorily completed all required maintenance and inspection work and had taken the necessary steps involved in "Aircraft protection"—AHS could still recover on its tort-based negligence claim based on the Incident.  *Aircraft Holding I*, 2022 WL 562760, at *5 (citing *Nat'l Rifle Ass'n of Am. v. Ackerman Mcqueen, Inc.*, 2021 WL 3618113, at *18 (N.D. Tex. Aug. 16, 2021) (Fish, J.)).

AHS proved that BAS breached the common law "duty to exercise ordinary care to avoid injury or damage to the property of others." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 614 (Tex. 2016) (quoting *Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 563 (Tex. 1948)); *see also Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010) ("Independent of its contractual obligations, Gilbert owed RTR the duty to comply with law and to conduct its operations with ordinary care so as not to damage RTR's property, and . . . could be liable for damages it caused by breaching its duty.").  Because AHS has proved that BAS engaged in negligent conduct that breached an implied common law duty of care, "the source of the duty allegedly breached was tort-based, not contract-based." *Aircraft Holding I*, 2022 WL 562760, at *6.

2

As explained in *Aircraft Holding I*, the damages AHS suffered also extend beyond the loss of CH300's anticipated benefit under the Proposal and Work Order.  As already noted, CH300 and BAS bargained for certain specified inspection and maintenance services.  In this lawsuit, AHS does not seek the value of performance of the maintenance inspection or money paid to another entity to perform a replacement maintenance inspection.  Rather, it seeks to recover for the extensive damage caused to the Aircraft when, as a result of BAS's negligence unrelated to the actual performance of its contractual obligations, the Aircraft fell off its jacks.

As the court will discuss next, AHS seeks as damages the diminution in the Aircraft's pre-Incident value and the amount for which it sold.  This measure of damages is independent of, and unrelated to, CH300's contractual expectancy or "benefit of the bargain" under the Proposal and Work Order.  Diminution-in-value damages seek to approximate the extent of the damage to the Aircraft as a whole, giving no consideration to the value or anticipated value of the bargained-for maintenance and inspection services.  *See Chapman Custom Homes*, 445 S.W.3d at 719 (economic loss rule did not apply where, *inter alia*, "the damages allegedly caused by the breach of [an independent] duty extend beyond the economic loss of any anticipated benefit under the plumbing contract.").

Accordingly, the court holds that the economic loss rule does not bar AHS's negligence claim.

III

The court now determines whether AHS has proved that it was damaged by BAS's negligence.[8] AHS seeks damages "measured by the difference between the fair market value of the Aircraft when it was delivered to BAS and its fair market value when sold or at the time of trial." 2d Am. Compl. ¶ 24.

A

The court finds from the trial evidence that the fair market value of the Aircraft when it was delivered to BAS—i.e., the pre-Incident value of the Aircraft—was $6,725,720. Kenneth Dufour ("Dufour"), an expert in aircraft appraisal, testified that he calculated the pre-Incident value using a market comparison approach that utilized sales data obtained from several reliable sources, including VREF, which is an aircraft valuation tool commonly used by appraisers. He inspected the Aircraft, reviewed its permanent records, and analyzed sales data for 10-12 comparable Challenger 300s—i.e., those with a production year between 2003 and 2006. He then opined, based on comparison sales from around the time of the Incident, that the value of the Aircraft on the day before the Incident was $6,725,720. The court finds Dufour's testimony to be both credible and reliable, and it is persuaded by his expert opinion

_____

[8]Under Texas law, the "elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). BAS does not dispute that it was negligent or that diminution in value is a proper measure of damages. BAS relies on the economic loss rule to bar recovery, and it disputes the amount of damages that AHS seeks.

regarding the pre-Incident value of the Aircraft.[9]  Accordingly, in calculating the diminution in value of the Aircraft, the court will use $6,725,720 as the pre-Incident value of the Aircraft.

B

The court next determines the fair market value of the Aircraft at the time of sale.  It is undisputed that AHS sold the Aircraft on March 17, 2021 for $3.4 million ("March 2021 Sale").  But at the time of the March 2021 Sale, the Aircraft had not yet been returned to service, and a significant amount of calendar-driven maintenance unrelated to the Incident had not been completed.  The court finds that the Aircraft was not returned to service before the March 2021 Sale because plaintiffs[10] refused to authorize a test flight.  It also finds that, over the course of nearly three years, plaintiffs refused to authorize any calendar-driven maintenance work to be performed on the Aircraft.  Both of these factors impacted the March

---

[9]Plaintiffs argued at trial and in their post-trial brief that Dufour's expert opinion is entitled to little, if any, weight because two of his reports "limited the validity of the appraisal and his statement of values to a time period tied to the effective date of the appraisal."  Ps. Post-Trial Br. 20.  The court disagrees.  Plaintiffs base their argument on standard disclaimer language in Dufour's appraisal that states: "[t]he appraisal contained herein and the statement of values and limiting conditions are valid solely to the addressee only for a period of 30 days following the date of this appraisal."  Tr. 4B:79.  But this standard language, which is included to protect against liability in the non-litigation context, does not apply where, as here, Dufour opined on the Aircraft's pre-Incident value, which is a fixed value at a fixed period of time.

[10]The court refers to "plaintiffs" collectively in this section because some actions were, or can reasonably be inferred to have been, taken on behalf of both AHS and CH300.  The refusal to authorize a test flight appears to have been an act of both plaintiffs.  *See* D. Ex. 10 at 2 (stating that "Owner," defined to mean AHS and CH300, collectively, rejects demand to consent to test flight).

- 13 -

2021 Sale price.

The court also finds that, had plaintiffs permitted the Aircraft to be returned to service and authorized the completion of all calendar-driven maintenance prior to the March 2021 Sale, the Aircraft would have sold for a substantially higher price than $3.4 million. William Bergenty ("Bergenty"), of Central Connecticut, whose company purchases, sells, and repairs aircraft, testified that if AHS had maintained the Aircraft in accordance with the maintenance manual, he would have paid more for the Aircraft in the March 2021 Sale. He also testified that, after he completed the timed maintenance services on the Aircraft, none of which related to the Incident, he sold the Aircraft ("September 2021 Sale") "as soon as [it] was available on the market, . . . [i]nstantly," for $7.2 million. Tr. 4A:20. Dufour, BAS's aircraft valuation expert, credibly and reliably testified that comparable aircraft—i.e., 2005 Challenger 300s with serial numbers[11] close to the Aircraft—had sold around the time of the March and September 2021 sales at prices that aligned much more closely with $7.2 million than with $3.4 million. For example, Dufour testified that in June 2021 a 2005 Challenger 300, serial number 20042, sold for $7.6 million; in July 2021 a Challenger 300 sold for $7 million; in May 2021 a Challenger 300 sold for $6.4 million; and in July 2021 a Challenger 300 sold for $6.5 million. He also opined that plaintiffs could have sold the Aircraft for a price similar to $7.2 million "had they done to the same aircraft exactly what [Bergenty]

---

[11]Dufour explained that an aircraft's age can be determined by its serial number: that in this case the Aircraft's serial number was 20040, and that an Aircraft with serial number 20042 was "just two in the production line after the aircraft in this case." Tr. 4B:73.

did." Tr. 4B:76.

Based on this evidence, the court finds that the $3.4 million March 2021 Sale price—which was significantly lower than the fair market value of comparable aircraft—is in large part attributable to plaintiffs' conduct, not the Incident. Once the Aircraft was returned to service and the calendar-driven maintenance was completed, it sold right away for $7.2 million, a figure that the court finds reflects its true post-Incident value.[12] As explained above, the pre-Incident value of the Aircraft was approximately $6.7 million dollars; the value of the Aircraft after it was maintained as required and returned to service was approximately $7.2 million.[13] See D. Post-Trial Br. 7 (arguing that "[a]ny damage calculation should include a comparison of the value of the Aircraft before the incident and the value of the Aircraft after it was maintained as required and returned to service, which AHS had a duty to do as the owner of the Aircraft and a plaintiff seeking damages."); *see also* Tr. 1A:38 ("AHS claims damage is the diminution, which is the pre-incident value

---

[12]Dufour testified that there was increased demand for private aircraft following the COVID-19 pandemic. And Bergenty testified that the Aircraft is worth more than $11 million today. It is thus possible that the September 2021 Sale price is higher than what the Aircraft would have sold for in March 2021, when demand may not have been as strong. But because no evidence was presented regarding March 2021 sales prices for comparable aircraft, the court cannot find that the Aircraft had a lower fair market value in March 2021 than in September 2021.

[13]At trial and in its post-trial brief, BAS maintains that the diminution in value amount of the Aircraft should be calculated as the difference between the pre-Incident value and the $3.4 million sale price, discounted to reflect AHS's failure to mitigate its damages. Whether viewed as a failure to mitigate or as a failure to prove diminution-in-value damages attributable to the Incident, the outcome is the same: AHS is not entitled to recover any amount in damages for its negligence claim.

minus the $3.8 million that they sold the aircraft [for]. However, . . . part of the reason the aircraft only sold for $3.8 million is they didn't let BAS return it to service. They didn't do the inspections they were required to do. Had they done that, we know that the value of the aircraft was at least $7.4 million, not [$]3.8 [million].").

Although a plaintiff is not required at trial to prove its damages with "exact specificity," *Maya Special Maritime Enter. v. Crochet*, 2016 WL 4190153, at *14 (S.D. Tex. Aug. 9, 2016), it "must prove the amount of [its] damages with reasonable certainty," *Schmueser v. Burkburnett Bank*, 937 F.2d 1025, 1030 (5th Cir. 1991) (citing *Midland Valley Plaza, Inc. v. Ga. R.R. Bank & Tr.*, 542 F.2d 945 (5th Cir. 1976)); *see also L.C.L. Theatres, Inc. v. Columbia Pictures Indus., Inc.*, 619 F.2d 455, 456 (5th Cir. 1980) ("[r]easonable certainty as to the amount of damages is all that is required of the plaintiff and he need not show the amount of the loss or damage with mathematical exactness." (citation omitted)). Because the court cannot determine based on the trial evidence whether there was any diminution in value of the Aircraft attributable to the Incident,[14] it holds that AHS is not entitled to recover diminution-in-value damages.

Because AHS does not seek any other measure of damages, the court finds in BAS's favor on AHS's negligence claim: AHS proved that BAS was negligent, but did not prove the amount of its damages with the required reasonable certainty.

---

[14]It is theoretically possible that, but for the Incident, the Aircraft's value at the time of sale would have been higher than $7.2 million. But there was no evidence presented at trial that the court finds would support such a finding.

IV

The court now turns to CH300's DTPA claim.

A

The DTPA provides consumers a cause of action for false, misleading, or deceptive acts or practices. *See* Tex. Bus. & Com. Code Ann. § 17.50(a); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996).

> The elements of a DTPA claim are: (1) the plaintiff was a consumer; (2) the defendant either engaged in false, misleading or deceptive acts (i.e., violated a specific laundry-list provision of the DTPA) or engaged in an unconscionable action or course of action; and (3) the DTPA laundry-list violation or unconscionable action was a producing cause of the plaintiff's injury.

*Windle v. Synthes USA Prods., LLC*, 2012 WL 1252550, at *4 (N.D. Tex. Apr. 13, 2012) (Fitzwater, C.J.) (citing *Amstadt*, 919 S.W.2d at 649).

B

Assuming *arguendo* that CH300 is a "consumer" under the DTPA,[15] the court nevertheless finds in BAS's favor on this claim because CH300 failed to prove that BAS

---

[15]The DTPA defines a consumer as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more." Tex. Bus. & Com. Code Ann. § 17.45(4) (West 2021). The term "'[b]usiness consumer' means an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use. The term does not include this state or a subdivision or agency of this state." *Id*. § 17.45(10). Because the court holds that CH300 failed to prove that BAS violated the DTPA, the court will assume, without deciding, that CH300 is a DTPA "consumer."

- 17 -

engaged in false, misleading, or deceptive acts, or unconscionable conduct, or that such conduct caused any injury.

1

To the extent that CH300 bases its DTPA claim on alleged misrepresentations in the Proposal, the court finds that CH300 did not prove that any statement in that document was false, misleading, or deceptive.

The Proposal states: "Our OEM network specializes in only Bombardier products. Our facilities, training, and expertise are unmatched in the industry.  We know your aircraft better than anyone! . . . Each of our centers is stocked with significant parts inventory and specialized tooling for your convenience."  D. Ex. 1 at 1.  CH300 contends that these representations were false or misleading because (1) BAS did not have unmatched expertise in the industry and had to rely on subcontractors and vendors for several facets of work, including nondestructive testing by Tailwind, and symmetry and alignment inspection by CAMS; (2) BAS's supplier, Sonaca, was not the OEM, so Sonaca presumptively knew less than the normal manufacturer about wing panels; (3) BAS used parts from a manufacturer in Taiwan for parts associated with the aft belly skin repair; and (4) BAS used parts from Mecachrome to fabricate the LH wing rear spar.

Even if it were true, as CH300 contends, that BAS did not have unmatched expertise[16] and a parts inventory sufficient to *repair* the Aircraft, these facts do not persuade the court,

---

[16]The court disagrees that BAS's use of subcontractors and vendors proves that it did not have "unmatched expertise in the industry."  Ps. Post-Trial Br. 3.

as trier of fact, that any statement in the Proposal was false or misleading.  This is because the Proposal related only to the 144-month inspection and maintenance described in the Work Order, not to any post-Incident repair, and there is no evidence that BAS's statements were false or misleading in the context of the bargained-for services, i.e., the 144-month inspection and related maintenance.[17]

2

CH300 also cannot recover under the DTPA based on any alleged misstatement in the Bombardier Aircraft Service Centers Proposal Terms and Conditions ("Proposal Terms and Conditions").  The Proposal Terms and Conditions provide, in relevant part: "[d]iscrepancies *found during the work scope* or reported by the customer will be entered in our Aircraft Work Order forms.  Deferral, troubleshooting, or repair alternatives will be discussed with the customer upon discovery of any discrepancies and the customer's authorization will be

---

[17]Plaintiffs argue in their post-trial brief:

> Bombardier would have been expected, based on its representations, to have the service skills and parts to perform a 144-month inspection *and* address any issues arising from the inspection.  Because the inspection included the entire plane, the nose, the wings, the fuselage, the tail, its is foreseeable that any of those parts could be required for replacement in connection with a 144-month inspection.

Ps. Post-Trial Br. 7-8.  The court disagrees.  Nothing in the Proposal or Bombardier Aircraft Services Centers Proposal Terms and Conditions suggests that the parties could have predicted, in connection with a routine 144-month inspection, that BAS's negligence would cause the Incident and require the subject repairs.  Accordingly, BAS's representations in the context of the 144-month inspection and maintenance described in the Proposal cannot be interpreted to encompass an unpredictable accident wholly outside the scope of the contract.

- 19 -

obtained prior to working on such discrepancies." D. Ex. 1 at 10 (emphasis added). The Proposal Terms and Conditions also state: "BAS provides documentation required by the FAA . . . relating to the work performed, by making maintenance record entries in the aircraft log book. Major repairs and major alterations are made in accordance with FAA approved data and recorded on FAA form 337." *Id.* CH300 asserts that these statements were false, misleading, or deceptive under the DTPA because BAS charged it for work performed under at least 13 work orders without first discussing discrepancies or obtaining AHS's or CH300's authorization to perform the work, and no Form 337 was ever issued for the major repair associated with the Incident. CH300's argument, however, is misplaced.

The Proposal Terms and Conditions accompanied only the Proposal, which was limited in scope to the work to be performed in connection with the 144-month inspection and related maintenance. BAS did not perform any "major repairs" under the Work Order to which the Proposal Terms and Conditions apply. Nor did it ever perform unauthorized work related to a discrepancy "*found during the work scope*," i.e., during the 144-month inspection and related maintenance.

All post-Incident repair and preservation was performed under the Repair Order and the 13 subsequent BAS work orders to which CH300 refers. But none of these subsequent work orders, particularly the Repair Order, which Bombardier prepared, incorporated BAS's Proposal Terms and Conditions. Accordingly, representations in the Proposal Terms and Conditions could not have been false, deceptive, or misleading with respect to *post-Incident* repairs and preservation, because that work falls outside the scope of the Proposal and

accompanying Proposal Terms and Conditions.

3

Alternatively, to the extent that CH300's DTPA claim is based on the above-quoted statements in the Proposal Terms and Conditions, CH300 did not prove that BAS's alleged failure to obtain authorization for its post-Incident work or to record "major repairs" on a Form 337 amounted to anything more than a mere breach of contract.

"[A] mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (per curiam) (quoting *Ashford Dev., Inc. v. USLife Real Estate Servs.*, 661 S.W.2d 933, 935 (Tex. 1983)).  BAS's statements in the Proposal Terms and Conditions are nothing more than a representation that it would fulfill its contractual duty, "and the breach of that duty sounds only in contract." *Id.*  The statements themselves did not cause any harm. *Id.*  Rather, it was the alleged failure to obtain CH300's authorization and alleged failure to record the post-Incident repairs on FAA Form 337 (i.e., the breach of contract) that actually caused CH300's alleged injury, and that injury is governed by contract law, not the DTPA. *Id.* at 14-15; *see also, e.g.*, *Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 295 (5th Cir. 2016) (per curiam) (affirming dismissal of DTPA claim where plaintiffs' "allegations were essentially . . . that (1) Defendant represented that it would perform under the contract, and (2) nonperformance meant that Defendant misrepresented that it would perform under the contract." (brackets omitted) (quoting *Malsom v. Match.com, L.L.C.* 540 Fed. Appx. 412, 415 (5th Cir. 2013))).

4

To the extent that CH300 bases its DTPA claim on alleged misrepresentations in connection with Bombardier's *repair* of the Aircraft—such as BAS's statement that "[w]e are confident that the proposed replacement of the affected areas of the aircraft will satisfactorily address any damage the aircraft sustained," P. Ex. 49 at 1, and Bombardier's statement that "Bombardier's factory Mobile Repair Team ('MRT') will perform the repairs. . . . It supports OEM repair solutions for Bombardier customers worldwide, and it will restore the Aircraft to blueprint, where possible," P. Ex. 81 at 2—CH300 has failed to prove that these statements, even if false or misleading, were a producing cause of its injury.[18]  This is because CH300 did not present any evidence that it was involved in or approved BAS's decision to repair the damaged Aircraft using Bombardier's services.  As BAS correctly argues:

> there was no transaction between BAS and CH300 relating to the repairs.  The repairs were performed pursuant to a contract between BAS and Bombardier and were not paid for by Plaintiffs.  CH300's reliance upon any statements made in connection with the repair work that Bombardier, Inc. performed is insufficient to support a judgment on its DTPA claim against BAS because there is no causal link between them and the transaction between CH300 and BAS.

D. Post-Trial Br. 11 (emphasis and citations omitted).  In other words, CH300 did not prove that it could have been injured by these statements because it did not present any evidence

---

[18]In addition, CH300 has failed to provide the court with any basis on which CH300 can recover on a DTPA claim against *BAS* based on false or misleading statements made by *Bombardier*.

at trial that it took any kind of action or in any other way relied on them.[19]

5

Finally, CH300 maintains that BAS acted unconscionably by

> us[ing] its specialized knowledge, skills, and training
> (concerning the aviation industry, the cost, time, and methods of
> repair for the Aircraft) to take advantage of Plaintiffs' lack of
> knowledge, vulnerability, and naivety (regarding the aviation
> industry and nature of repairs) to foist the Aircraft that was not
> fully repaired onto Plaintiffs,

Ps. Post-Trial Br. 3, and by "threaten[ing] to put the risk of delay on Plaintiffs, tender[ing]

estimated costs of the repair, and 'requir[ing]' Plaintiffs to 'remov[e] . . . the Aircraft from

BAS's facility,'" *id.* at 4 (some alterations in original).

The DTPA defines "[u]nconscionable action or course of action" to mean "an act or

practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability,

experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code

Ann. § 17.45(5). "To prove an unconscionable action or course of action, a plaintiff must

show that the defendant took advantage of his lack of knowledge and 'that the resulting

unfairness was glaringly noticeable, flagrant, complete and unmitigated.'" *Bradford v.*

---

[19]Plaintiffs also contend that BAS represented that it would not charge CH300 for any
costs associated with repair work on the Aircraft when, in fact, after it closed the Repair
Order, it charged CH300 the sum of $11,229.90 for work associated with the repair and re-
identification of the Aircraft's ribs and the sum of $22,846.70 for "perform[ing] symmetry
check post repair of damaged wing and fuselage." Ps. Post-Trial Br. 6 (quoting D. Ex. 69).
But in a post-trial letter to the court dated February 13, 2023, BAS stated that it had
inadvertently included these two charges in its preservation-related damages and that the full
amount for these two charges had been or should have been credited back to CH300.

*Vento*, 48 S.W.3d 749, 760 (Tex. 2001) (quoting *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998)).  CH300 did not make this showing with respect to BAS's conduct.

Although BAS damaged the Aircraft through its negligence, it subsequently repaired the Aircraft at no cost to CH300.  BAS (through Bombardier) replaced or repaired all damaged areas of the Aircraft and notified plaintiffs when the Aircraft was ready to be returned to service.  When plaintiffs refused to retrieve the Aircraft—instead ordering BAS to continue to store the Aircraft to prevent "spoliation issues" that could interfere with the lawsuit *plaintiffs filed* or the FAA investigation *plaintiffs initiated*, BAS charged CH300 storage fees and preservation costs that it believed, based on the "storage fee" provision in the Proposal Terms and Conditions, it was contractually permitted to charge.

Based on these facts, the court finds that BAS did not engage in an unconscionable action or course of action.

## C

In summary, the court finds in BAS's favor with respect to CH300's DTPA claim because CH300 failed to prove that BAS engaged in false, misleading, or deceptive acts, or unconscionable conduct, or that such conduct was a producing cause of CH300's injury.

- 24 -

V

The court now considers CH300's breach of contract claim.  BAS does not dispute that it breached the Proposal and Work Order.  Instead, BAS challenges CH300's claim for loss-of-use damages in the amount of $2,286,450 as the remedy for breach of contract.[20]

A

Assuming *arguendo* that the loss-of-use damages that CH300 seeks constitute consequential (as opposed to direct) damages,[21] the court must decide as a threshold matter whether CH300 is barred from recovering this type of damages under the Work Order Terms and Conditions.

The "Limitation of Liability" provision of the Work Order Terms and Conditions provides:

_____

[20]CH300 maintains in its post-trial brief that "[a]t its simplest, and most undisputed level, BAS breached its contract with CH300 when it failed to perform the 144-month inspection without damaging the Aircraft, and by so doing established all four (4) elements of proof needed to prove breach of contract."  Ps. Post-Trial Br. 10.  The court assumes that CH300 intends to assert that BAS's conduct breached the "common law duty to perform with care and skill [that] accompanies every contract," under Texas law.  *Chapman Custom Homes*, 445 S.W.3d at 718 (citing *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947)).  At trial, BAS did not dispute that it breached its contract with CH300.

[21]"[L]ost use damages are frequently, but not categorically, consequential in nature."  *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 121 (Tex. App. 2011, no pet.); *see also J & D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016) ("Loss-of-use damages are often appropriately couched in terms of consequential damages.").

> Customer acknowledges that the prices BAS has agreed to charge customer for the goods and services covered by this Agreement have been agreed upon by BAS in reliance upon Customer's agreements limiting BAS' liability set forth above and below, and that without such agreements, BAS would be unwilling to provide such products and services for the price and other terms set forth herein. BAS' LIABILITY ON ANY CLAIM OF ANY KIND, INCLUDING BREACH OF CONTRACT OR WARRANTY OR FOR NEGLIGENCE OR OTHER CONDUCT, FOR ANY LOSS OR DAMAGE ARISING OUT OF, CONNECTED WITH, OR RESULTING FROM THIS AGREEMENT, OR FROM THE PERFORMANCE OR BREACH THEREOF, OR FROM THE SALE, DELIVERY, RESALE, OR REPAIR OF ANY GOODS COVERED BY OR FURNISHED UNDER THIS AGREEMENT SHALL IN NO CASE EXCEED THE PRICE ALLOCABLE TO THE WORK, GOOD, OR PART THEREOF WHICH GIVES RISE TO THE CLAIM. IN NO EVENT SHALL BAS BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO LOST PROFITS.

D. Ex. 2 at 2 (upper case font in original).  In *Aircraft Holding I* the court held, in the context of BAS's motion for summary judgment, that "[b]ecause there are at least two reasonable interpretations of the Limitation of Liability provision—i.e., that it limits liability for *all claims* or that it limits liability *for only warranty claims*—the . . . Work Order Terms and Conditions are ambiguous on their face." *Aircraft Holding I*, 2022 WL 562760, at *19.

When a court determines that a contract is ambiguous, "[t]he trier of fact must resolve the ambiguity by determining the true intent of the parties," *Coker v. Coker*, 650 S.W.2d 391, 394-95 (Tex. 1983) (citation omitted), taking into account extrinsic evidence "to help determine the language's meaning," *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 480 (Tex. 2019) (citation omitted); *see also Italian Cowboy Partners, Ltd. v.*

*Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333-34 (Tex. 2011) ("'[I]f the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent.' 'Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument.'" (citations omitted)); *Plotkin v. Joekel*, 304 S.W.3d 455, 470 (Tex. App. 2009, pet. denied) ("If a contract is ambiguous, the contract's interpretation becomes a fact issue to be resolved by deciding the parties' true intent, for which the fact finder may consider extraneous evidence of intent." (citations omitted)).

Because BAS is relying on an affirmative defense, it has the burden of proving that the Limitation of Liability provision of the Work Order Terms and Conditions bars CH300's claim for damages. *See, e.g.*, *IHR Sec., LLC v. Innovative Bus. Software, Inc.*, 441 S.W.3d 474, 481 (Tex. App. 2014, no pet.) ("The limitation of liability provision in the contract constitutes an affirmative defense under Tex. R. Civ. P. 94 because [defendant] is attempting to avoid actual damages by arguing that its liability is predetermined and limited."). The court finds that BAS failed to prove that the parties intended that the Limitation of Liability provision apply to *all* claims (i.e., including claims for breach of contract), as opposed to warranty claims alone.

BAS did not present at trial any extrinsic evidence on the question of the parties' intent with respect to the Limitation of Liability provision. For example, it did not introduce proof of the parties' subjective intent and conduct, the surrounding facts and circumstances, the parties' course of performance in performing the contract, or industry custom and usage.

- 27 -

*See, e.g.*, *Heatcraft Refrigeration Prods. LLC v. Freezing Equip. Co.*, 2022 WL 975611, at *12 (N.D. Tex. Mar. 31, 2022) (Lindsay, J.) ("Evidence of the parties' subjective intent and conduct, and surrounding facts and circumstances, including evidence of the parties' course of performance in performing the contract and industry custom and usage [is] relevant after the court has determined that the contract is ambiguous." (citations omitted)); *see also, e.g.*, *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) ("Parol evidence—such as the parties' course of performance—may be used to ascertain the intent of the parties only if the contract is first found to be ambiguous." (citation omitted)).

In its post-trial brief, BAS relies exclusively on its own interpretation[22] of the Work Order Terms and Conditions, contending that its "interpretation applies to CH300's contract-based claim" because "[b]y its own terms, this provision applies to 'any claim of any kind, including breach of contract.'" D. Post-Trial Br. 14 (capitalization omitted) (quoting D. Ex. 2 at 2). But BAS's interpretation of the contract must be weighed against CH300's contrary interpretation.[23]

The court, as trier of fact, finds that the Limitation of Liability provision of the Work

---

[22]In determining the true meaning of an ambiguous contract, the court, as trier of fact, is permitted to consider the parties' interpretation. *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 510 (Tex. 1995) ("Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument." (citations omitted)).

[23]CH300 argued at trial that the Limitation of Liability provision did not apply to its claim for damages because it was not conspicuous, it did not provide fair notice, and ambiguity in a contract is to be construed against the drafter.

- 28 -

Order Terms and Conditions only limits BAS's liability in the context of warranty claims.

As the court explained in *Aircraft Holding I*:

> The "Limitation of Liability" provision is contained within Article 9 of the Work Order Terms and Conditions under the heading "Warranty." The four sub-parts directly preceding the Limitation of Liability provision relate only to the warranty: Section A sets forth the general scope of BAS's warranties; Section B details the terms and conditions; Section C addresses limitations and exclusions to the warranties; and Section D states that there are no other warranties/representations. *See* [D. Ex. 2 at 2, art. 9]. A reasonable reading of Section E, the "Limitation of Liability" provision, is that this section, like the four preceding sections, applies only within the context of BAS's warranty and describes the limitations of liability with respect to warranty claims. Had BAS intended to limit its liability for *all* claims, there would have been no logical reason to include the Limitation of Liability provision within Article 9.

*Aircraft Holding I*, 2022 WL 562760, at *19. Moreover, the language of the Limitation of Liability provision supports the reasonable conclusion that liability is only limited within the context of warranty claims. BAS generally warrants against various defects in materials and workmanship. D. Ex. 2 at 2, art. 9, sec. A. A reasonable reading of the Limitation of Liability provision is that BAS used the phrase "WORK, GOOD, OR PART" to refer back to the specific defects in workmanship (i.e., "WORK") or materials (i.e., "GOOD" or "PART") that it warranted against. *Aircraft Holding I*, 2022 WL 562760 at *19. Although the court was prohibited at the summary judgment stage from selecting between two reasonable but competing interpretations, it is now permitted, as trier of fact, to determine which interpretation represents the parties' true intent. The court finds that CH300's interpretation—i.e., that the Limitation of Liability provision only applies in the context of

- 29 -

warranty claims—is the more logical reading of the contract.

## B

Having concluded that the Limitation of Liability provision in the Work Order Terms and Conditions does not apply to CH300's breach of contract claim, the court must now determine the amount that CH300 proved it is entitled to recover as loss-of-use damages.

## 1

"Loss-of-use damages are often appropriately couched in terms of consequential damages." *J & D Towing, LLC v. Am. Alt. Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016) (citation omitted).

> By design, loss-of-use damages compensate a property owner for damages that result from "a reasonable period of lost use" of the personal property. The amount of damages may thus be measured according to the *particular loss experienced*, such as the amount of lost profits, the cost of renting a substitute chattel, or the rental value of the owner's own chattel.

*Id.* at 655-56 (emphasis added) (footnotes omitted). If, however, "the purported consequential damages are 'too remote, too uncertain, or purely conjectural, they cannot be recovered.'" *Id.* at 655 (quoting *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)). This is because

> [a]s with all consequential damages, the availability of loss-of-use damages is necessarily circumscribed by commonsense rules. To begin with, the damages claimed may not be "too remote." This is not to say they must be "the usual result of the wrong," but they must be foreseeable and directly traceable to the tortious act. The damages also must not be speculative. Although mathematical exactness is not required, the evidence offered must rise above the level of pure

conjecture.

*Id.* at 677 (footnotes omitted).

2

CH300's corporate representative , Gladys Orrantia Cantu ("Orrantia"), testified that CH300 actually spent $113,000 on alternative transportation as a result of BAS's breach of contract.[24]  Based on this evidence, the court finds that CH300 suffered loss-of-use damages in this amount.

But CH300 seeks a much larger sum—$2,286,450—in compensation for loss of use of the Aircraft.  It offered at trial the expert testimony of Del Fogg ("Fogg"), who opined that it would have cost CH300 the sum of $50,810 per month ($2,286,450, in total, for 45 months) to lease a similarly-aged Challenger 300 under a dry lease.[25]  But the court is not persuaded that Fogg's methodology is appropriately followed in this case to calculate loss-of-use damages.

First, although the rental value of a replacement is a recognized means of calculating

―――――――――――

[24]BAS appears to agree that CH300 is entitled to recover this amount in loss-of-use damages for its breach of contract claim.  *See* D. Post-Trial Br. 16 ("Under clearly established Texas Supreme Court precedent, [$113,000] is the total amount CH300 can recover for its loss of use of the Aircraft.").

[25]A dry lease refers to the lease of an aircraft without a flight crew.  Fogg testified that the dry lease methodology is reflective of ownership because it provides, "on paper," the opportunity to use the airplane, but it does not also include the costs of use, such as gas, insurance, and maintenance, "because if [CH300] owned the airplane, [it] still would have to pay for those things," and "none of those expenses should be borne by anybody else but the people that are leasing the airplane."  Tr. 2B:96, 98.

loss-of-use damages under Texas law, *see, e.g.*, *Dinn v. Hooking Bull Boatyard, Inc.*, 2009 WL 2161676, at *9 (S.D. Tex. July 16, 2009) ("Loss-of-use damages are calculated by determining the rental value for a similar item while the damaged item is being repaired."), Fogg did not offer any evidence that the hypothetical lease he came up with was for a reasonably equivalent replacement aircraft. *See* Tr. 2B:118 (Fogg conceded that his expert report failed to identify the "equivalent aircraft," failed to provide a source for the list price, failed to identify other dry lease agreements for similar aircraft, and failed to provide any information showing "that a dry lease of this amount was applicable during that time period.").

Second, Fogg admitted that his calculation did not take into account the operational expenses CH300 saved as a result of not having to operate the Aircraft while it was being repaired.

Third, and perhaps most important, it is undisputed that CH300 did *not*, in fact, lease a substitute aircraft.   Therefore, any hypothetical lease is contrary to the  undisputed evidence.  "Permitting loss-of-use damages . . . is not a license for unrestrained raids on defendants' coffers." *J & D Towing*, 478 S.W.3d at 677.  Moreover, "the availability of loss-of-use damages is necessarily circumscribed by commonsense rules." *Id.*  Accordingly, CH300 should not be permitted to recover $2,286,450 in loss-of-use damages based on a speculative, hypothetical dry lease when, in reality, it only spent $113,000 in alternative travel as a result of BAS's breach of contract.    Accordingly, the court finds that CH300 proved by a preponderance of the evidence that it suffered actual loss-of-use damages in the

amount of $113,000, but failed to prove that it is entitled to recover any additional amount.

C

BAS maintains that CH300's loss-of-use damages must be offset by the amount that it still owes BAS for the agreed-upon 144-month inspection and related maintenance services. The court agrees. As set out in the Proposal, the parties agreed that CH300 would pay BAS the sum of $133,235.00 for the 144-month inspection and related maintenance services. Orrantia testified that CH300 only paid $66,000 toward this total sum. Because BAS ultimately completed the inspection, CH300 received the full value of the bargained-for services. Accordingly, the court finds that BAS is entitled to recover on its breach of contract counterclaim the amount of the unpaid value ($67,235.00) of the 144-month inspection and related maintenance services. *See infra* § VI(F).

D

Accordingly, the court holds that CH300's loss-of-use damages amount to the sum of $113,000, but that BAS is entitled to an offset in the sum of $67,235.00 for the unpaid portion of the 144-month inspection and maintenance services it performed, resulting in a net award of $45,765.00 to CH300 for BAS's breach of contract.

VI

The court now turns to BAS's counterclaims, the first of which is a breach of contract counterclaim that is based on the following allegations: CH300 agreed to compensate BAS for the requested inspection and maintenance services and for storage fees incurred during idle time; BAS fulfilled its obligations under the Proposal and Work Order, along with the

Proposal Terms and Conditions and Work Order Terms and Conditions (collectively, the "Agreement"); and CH300 breached the Agreement by refusing to pay BAS for the inspection and maintenance services and storage fees.

A

Based on the trial evidence, the court finds that BAS completed the 144-month inspection and maintenance services outlined in the Proposal by October 31, 2018. The court also finds that CH300 breached the Agreement at least by refusing to pay for the bargained-for services outlined in the Proposal.[26] The court now turns to the question of damages.

B

BAS seeks to recover $864,000 in liquidated damages under the Proposal Terms and Conditions, which provides for storage fees of $1,000 per day for "[i]dle time following the completion of an aircraft inspection or examination while awaiting customer approval of work or corrective action." D. Ex. 1 at 10. Under the Proposal Terms and Conditions, "idle time" "[s]tarts when a list of findings and/or corrective actions have been submitted to the customer or upon closing a work order and ends upon receiving approval for work of sufficient magnitude to occupy 8 techs total for 2 complete shifts or when aircraft is returned to customer." *Id.*

---

[26]The court declines to address whether CH300 breached the Agreement by refusing to pay the agreed-upon storage fees during "idle time," as defined in the Proposal Terms and Conditions, because, as the court explains *infra* at § VI(D), BAS seeks unenforceable liquidated damages for this breach.

- 34 -

CH300 contends that BAS is not entitled to recover $1,000 per day in liquidated damages because this putative fee is an unenforceable penalty.

C

An enforceable liquidated damages contract provision establishes an "acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Atrium Med. Ctr., LP v. Hous. Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) (quoting *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 431 (Tex. 2005)). Courts enforce liquidated damages provisions when (1) "the harm caused by the breach is incapable or difficult of estimation," and (2) "the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *see also Atrium Med. Ctr.*, 595 S.W.3d at 192. When applying these first two rules, known as the *Phillips* prongs, courts examine the circumstances at the time the agreement is made. *See Atrium Med. Ctr.*, 595 S.W.3d at 192; *see also FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 69-70 (Tex. 2014) (stating courts must evaluate both prongs from perspective of parties at time of contracting). "The party seeking liquidated damages bears the burden of showing that the provision, as drafted, accounts for these two considerations." *Atrium Med. Ctr.*, 595 S.W.3d at 192 (citation omitted).

But a facially valid and enforceable liquidated damages provision may still operate as an unenforceable penalty due to unanticipated events arising during the life of a contract. *See id.* at 192-93 ("Liquidated damages must not be punitive, neither in design nor operation."); *see also Phillips*, 820 S.W.2d at 788. Thus courts must also determine whether

"'the actual damages incurred were much less' than the liquidated damages imposed, measured at the time of the breach." *Atrium Med. Ctr.*, 595 S.W.3d at 193 (citation omitted); *see also Phillips*, 820 S.W.2d at 788.  In other words, even if a liquidated damages provision satisfies the two *Phillips* prongs, when there is an "unbridgeable discrepancy" between the provision as written and the reality of its application, the provision cannot be enforced.  *FPL Energy*, 426 S.W.3d at 72.  The breaching party challenging the liquidated damages provision must demonstrate this "unbridgeable discrepancy." *Atrium Med. Ctr.*, 595 S.W.3d at 193.[27]

---

[27]In its post-trial brief, BAS contends that CH300 has waived the affirmative defense of "penalty" by not pleading it.  D. Post-Trial Br. 23-24.  The court disagrees.  The cases BAS cites for the proposition that CH300 had the burden to plead and prove that the liquidated damages provision operated as a penalty predate *Atrium Medical Center*, in which the Supreme Court of Texas clearly placed the initial burden of showing that the liquidated damages provision satisfies *Phillips* on the party seeking liquidated damages, i.e., BAS. Because the court finds that BAS did not meet its initial burden under *Phillips*, it need not consider whether CH300 was obligated to plead, as an affirmative defense, that the liquidated damages provision operated as a penalty or that there was an "unbridgeable discrepancy" between the provision as written and the reality of its application.  *See, e.g.*, *Marathon Oil Co. v. Koch Energy Servs., LLC*, 2023 WL 289714, at *4 (S.D. Tex. Jan. 18, 2023) (characterizing argument that there is an "unbridgeable discrepancy" between actual and liquidated damages as an affirmative defense in the context of a motion for leave to amend answer); *Chaudhary v. Mora*, 2022 WL 3722393, at *10 (Tex. App. Aug. 30, 2022, Rule 53.7(f) motion granted) (concluding that defendant waived argument that liquidated damages acted as a penalty by not asserting the defense of penalty in the trial court or specifically pleading it as an affirmative defense but addressing the two *Phillips* prongs, noting "we must uphold the summary-judgment award of liquidated damages—the earnest money and the holding fee—if we conclude that the [plaintiff] demonstrated that (1) damages for prospective breach of the original contract were incapable or difficult of estimation in May 2018 when the parties entered into the original contract and on July 5, 2018 when they signed the amendment, and (2) the amount of liquidated damages specified was, at the time, a reasonable estimate of projected actual damages.").

D

Based on the two *Phillips* prongs, the court finds that BAS failed to prove that the liquidated damages provision in the Proposal Terms and Conditions is facially enforceable. So the court does not reach the question whether CH300 proved an "unbridgeable discrepancy" between the provision as written and the reality of its application.

Under the first *Phillips* prong, the court considers whether the harm caused by the breach is incapable or difficult of estimation. *Phillips*, 820 S.W.2d at 788. BAS neither argues nor presented any evidence that, at the time the parties agreed to the Proposal and Proposal Terms and Conditions, it was difficult to estimate the damages that would result from BAS's having to store the Aircraft during "idle time" caused by CH300's conduct. *Cf. Atrium Med. Ctr.*, 595 S.W.3d at 193-94 (first *Phillips* prong satisfied by evidence that, in the context of a requirements contract, "the parties expected demand would vary, and thus they could not know the average weekly gross margin at the time they made the agreement); *BMB Dining Servs. (Willowbrook), Inc. v. Willowbrook I Shopping Ctr. L.L.C.*, 2021 WL 2231258, at *5 (Tex. App. June 3, 2021, no pet.) (finding liquidated damages provision satisfied first prong of *Phillips* based on length of lease and evidence that it was difficult to forecast market conditions for commercial real estate properties).

Nor did BAS satisfy the second *Phillips* prong by presenting any evidence that $1,000 per day represented a reasonable forecast of just compensation. *Phillips*, 820 S.W.2d at 788; *cf. Atrium Med. Ctr.*, 595 S.W.3d at 195 (trial court did not err in finding that cancellation charge equal to 40% of the greater of initial agreement value and current invoice amount

- 37 -

multiplied by the number of weeks remaining in agreement's term was a reasonable forecast of just compensation where the evidence demonstrated that "40 percent reflected a reasonable estimate for [plaintiff]'s [profit] margin based on its actual historical performance"). For example, BAS presented no evidence of the actual costs involved in storing an aircraft at its facilities. Nor did it prove that $1,000 per day was a reasonable estimate of the costs it would be forced to incur in the event of CH300's breach.[28] *See* Ps. Post-Trial Br. 12 ("The amount of $1,000 per day has not been shown by Defendant to be based on any relationship to either the cost of storing the Aircraft, or the [costs actually] incurred.").

The court finds that BAS failed to carry its burden with respect to either of the *Phillips* prongs. Accordingly, the court holds that, to the extent the "Aircraft Storage Fees" provision in the Proposal Terms and Conditions provides for liquidated damages in the amount of $1,000 per day, the provision is unenforceable. BAS is not entitled to recover on its breach of contract counterclaim seeking the sum of $864,000 in storage fees.[29]

---

[28]Moreover, the Supreme Court of Texas has held that "provisions that use the same damage measure for breaches of varying magnitude are . . . facially unreasonable." *Atrium Med. Ctr.*, 595 S.W.3d at 196 (citing *Stewart v. Basey*, 245 S.W.2d 484, 487 (Tex. 1952)). Under the Proposal Terms and Conditions, a customer who causes one day of "idle time" will be assessed damages at the same rate as a customer who causes "idle time" of several months or even years. The magnitude of these breaches is not equal because BAS would certainly incur more costs storing an aircraft over several months or years, when various preservation tasks must be performed, as opposed to a few days or weeks, when these tasks might not be necessary.

[29]Because BAS failed to carry its burden to establish the *Phillips* prongs, the court need not consider whether CH300 "met its burden to show that the liquidated damages

- 38 -

E

BAS also seeks the sum of $416,713.73[30] in "additional breach of contract damages" "to the extent preservation of the Aircraft is considered to be related to BAS's obligation to protect the Aircraft under the Contract."  Ds. Post-Trial Br. 24.  The court finds that BAS is not entitled to recover, *under the Agreement*, the costs it incurred in preserving the Aircraft after the Work Order was closed in October 2018.  This is because BAS was only obligated under the Proposal to "protect" the Aircraft during the 144-month inspection itself.[31]  BAS's preservation of the Aircraft *after* the Work Order was closed does constitute "Aircraft protection," as that term is used in the Proposal.

F

Although BAS failed to establish at trial that it is entitled to liquidated damages or any "additional breach of contract damages" related to preservation of the Aircraft, it did prove, as explained above, that CH300 breached the Work Order Terms and Conditions by failing

---

provision was otherwise unreasonable when compared with [BAS]'s actual damages." *Atrium Med. Ctr.*, 595 S.W.3d at 196; *see also id.* at 197-98 ("A breaching party need not prove the other party's actual damages to invalidate penalty provisions in every case—*Phillips* and *Stewart* demonstrate the opposite.  The liquidated damages provisions in those cases were facially invalid, without extrinsic evidence of actual damages, as the measures at the outset could not reasonably forecast actual damages.").

[30]At trial, and in its post-trial brief, BAS sought the sum of $451,651.48 in preservation-related damages.  But in a post-trial letter to the court dated February 13, 2023, BAS stated that it had inadvertently included in this amount two charges related to repair work on the Aircraft.  Accordingly, BAS clarified that it is only seeking $416,713.73 in preservation-related damages.

[31]*See supra* note 7.

to pay BAS in full for the 144-month inspection and maintenance services it performed. Accordingly, for the reasons discussed above, *see supra* § V(C), the court finds that BAS is entitled to recover the sum of $67,235.00 in damages for breach of contract (which is offset against CH300's recovery of $113,000).

VII

Finally, the court addresses BAS's quantum meruit counterclaim, under which it seeks to recover the $416,713.73 in labor, materials, and shop supply expenses that it incurred in preserving the Aircraft.

A

"*Quantum meruit* is an equitable remedy that 'is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.'" *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (quoting *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)). "The purpose of this common law doctrine is to prevent a party from being 'unjustly enriched' by 'retain[ing] the benefits of the . . . performance without paying anything in return.'" *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018) (alterations in original) (quoting *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988)). The elements of a claim under Texas law for quantum meruit are:

> (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged.

- 40 -

*Id.* at 732-33 (citation omitted).

Recovery should be allowed under quantum meruit when "non payment for the services rendered would result in an unjust enrichment to the party benefited by the work." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550 (5th Cir. 2010) (quoting *Vortt Expl. Co.*, 787 S.W.2d at 944). "The measure of damages in quantum meruit is the 'reasonable value of the work performed.'" *Id.* (quoting *Johnston v. Kruse*, 261 S.W.3d 895, 902 (Tex. App. 2008, no pet.)).

B

In finding in favor of BAS on its quantum meruit counterclaim, and in reaching its other decisions in this memorandum opinion, the court has accorded greater weight to the opinions and/or factual testimony of Mario Asselin, Marc Rivest ("Rivest"), and Michael Stephen Dittmar over that of Duggins and John E. Cochran, Jr. The defense witnesses' opinions were better supported, more reliable, and entitled to greater weight. Consequently, the court has rejected key positions taken by plaintiffs, such as that the Aircraft was not airworthy and ready to be returned to service on October 31, 2018. The court finds that the necessary repairs to the Aircraft had been made by October 31, 2018 and that the Aircraft was ready to be returned to service at that time; all that was needed was plaintiffs' authorization and a test flight, to which plaintiffs refused to consent.

C

It is clear that BAS rendered valuable services—i.e., preservation of the Aircraft from November 1, 2018 until its sale on March 17, 2021—and that these services were for the

benefit of CH300 as the operator who was contractually responsible for the Aircraft's maintenance.[32]

The court also finds, with respect to the third element, that CH300 both "accepted" and "used and enjoyed" BAS's services.  First, CH300 actually *demanded* that BAS preserve the Aircraft, stating in its counsel's October 19, 2018 letter: "the Owner demands that [BAS] continue to store the Aircraft to prevent spoliation issues.  Pursuant to the Federal Rules of Evidence, [BAS] is required to preserve evidence, *including the Aircraft*."  D. Ex. 10 at 2 (emphasis added).  The letter reiterated in closing: "[p]lease let me know if [BAS] will comply with its obligations to *preserve the Aircraft*, including properly storing the Aircraft and bearing all costs related to the storage of the Aircraft."  *Id.* (emphasis added).

Second, as discussed below, CH300 was made aware that BAS was performing preservation work on the Aircraft through the invoices that BAS sent through plaintiffs' counsel, yet it did nothing to stop BAS from continuing its services.  The court finds under these circumstances that the third element is satisfied.

---

[32]The May 18, 2015 Operating Agreement provides that CH300

> at its own cost and expense, shall service, repair, maintain and overhaul, test or cause the same to be done to the Aircraft during the term of this Agreement (i) to keep the Aircraft in good operating condition and appearance and (ii) to keep the Aircraft in such operating condition as may be necessary to enable the airworthiness certification of the Aircraft to be maintained in good standing at all times under all applicable governmental rules and regulations.

D. Ex. 3 at 2.

Regarding the fourth element, CH300 was reasonably notified that BAS expected to be paid for its services.  BAS informed CH300 in its October 15, 2018 letter that, if the owner did not authorize the work necessary to return the Aircraft to service, BAS would "tender the [A]ircraft to the owner at the BAS facility in its then current condition, *with all storage/hangar expense and risk of loss subsequently to be borne by the owner*."  D. Ex. 9 at 2 (emphasis added).  And Rivest, Bombardier's Director for Customer Support for the Americas, testified that BAS sent an invoice, through counsel, "for each of these storage days, from November 1st, 2018, to March 17th, 2021, for these [preservation] costs and for storage fees per the contract."  Tr. 4B:20.[33]  Based on this evidence, the court finds that CH300 was on notice that BAS expected to be paid for preserving the Aircraft.[34]

Weighing the equities, the court finds that nonpayment for the services rendered in this case would unjustly enrich CH300.  *See Hill*, 544 S.W.3d at 741 ("[T]he weighing of all equitable considerations . . . and the ultimate decision of how much, if any, equitable relief should be awarded, must be determined by the trial court." (alteration in original) (quoting

---

[33]The first invoice was not actually sent to counsel until June 2020.  After that date, they were sent on a monthly basis until the Aircraft was sold.  *See* Tr. 4B:21-22.

[34]The only argument CH300 apparently advances in opposition to BAS's quantum meruit counterclaim is that "[g]enerally, quantum meruit is unavailable when there is a written contract and here we have a contract."  Ps. Post-Trial Br. 12.  Plaintiffs are correct that, generally, a party "who seeks to recover the reasonable value of services rendered or materials supplied will be permitted to recover in quantum meruit only when there is no express contract covering those services or materials."  *Truly*, 744 S.W.2d at 936.  The Agreement in this case, however, does not cover preservation of the Aircraft, which CH300 demanded *after* BAS closed the Work Order and notified CH300 that the repair work was finished.

- 43 -

*Hudson v. Cooper*, 162 S.W.3d 685, 688 (Tex. App. 2005, no pet.))). Accordingly, the court holds that BAS is entitled to recover $416,713.73 in quantum meruit for the costs it incurred in preserving the Aircraft.[35]

## VIII

Based on a preponderance of the evidence and the controlling law, this decision seems quite fair and just. BAS damaged the Aircraft through its negligence, but it arranged for Bombardier to repair the Aircraft at no cost to AHS or CH300 and to return it to airworthiness. CH300 is awarded its reasonable damages for loss of use of the Aircraft due to BAS's breach of contract. AHS receives no award for diminution in the Aircraft's value, but this is because AHS failed to prove that the Aircraft in fact diminished in value between March 28, 2017 and March 17, 2021. CH300 does not recover under the DTPA, but this is because it failed to prove this claim. BAS is awarded as an offset to CH300's loss-of-use damages the unpaid balance of what CH300 owes BAS under the parties' contract for 144-month inspection and maintenance services. And BAS is awarded on its quantum meruit counterclaim the sums it expended for costs to preserve the Aircraft from November 1, 2018 until its sale on March 17, 2021—expenses that CH300 would have paid someone in order to operate the Aircraft had CH300 retrieved the Aircraft, as it should have, on or about

---

[35]To the extent that BAS seeks "damages for storing the Aircraft," D. Post-Trial Br. 25, and insofar as BAS's post-repair invoices totaling $416,713.73 do not already reflect the costs BAS incurred in "storing" the Aircraft, the court finds that BAS failed to prove at trial the value of any additional "storage" services. Accordingly, the court limits BAS's quantum meruit award to the sum of $416,713.73.

October 31, 2018.

* * *

In sum, for the reasons explained, the court will file today a judgment in favor of BAS on its quantum meruit counterclaim in the sum of $416,713.73, and in favor of CH300 on its breach of contract claim in the net sum of $45,765.00 ($113,000 in loss-of-use damages minus an offset of $67,235.00 to which BAS is entitled on its breach of contract counterclaim). The remaining claims asserted in a claim or counterclaim will be dismissed.

March 14, 2023.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 45 -